**UNITED STATES of America, Plaintiff,**

v.

**CROCKER-ANGLO NATIONAL BANK, Citizens National Bank, and Transamerica Corporation, Defendants.**

**Civ. No. 41808.**

United States District Court
N. D. California.
Oct. 30, 1967.

Lyle L. Jones, Antitrust Division, Dept. of Justice, San Francisco, Cal., Herbert G. Schoepke, Charles A. Degnan, Lawrence M. Jolliffe, Antitrust Division, Dept. of Justice, Washington, D. C., for plaintiff.

Richard J. Archer, Douglas C. White, Morrison, Foerster, Holloway, Clinton & Clark, San Francisco, Cal., for defendants Crocker-Anglo National Bank and Citizens National Bank.

Christopher M. Jenks, Ralph C. Walker, Robert A. Keller, III, Orrick, Dahlquist, Herrington & Sutcliffe, San Francisco, Cal., for defendant Transamerica Corp.

Charles H. McEnerney, Joseph J. O'Malley, Office of the Comptroller of the Currency, Washington, D. C., for intervenor Comptroller of the Currency.

Webster V. Clark, R. J. Hecht, Rogers, Clark & Jordan, San Francisco, Cal., for intervenor Superintendent of Banks, State of California.

## OPINION AND ORDER DISMISSING COMPLAINT

Before POPE, Circuit Judge, SWEIGERT and ZIRPOLI, District Judges.

ZIRPOLI, District Judge.

■ Based upon reasonable *probabilities* arising from the actual and practical realities of the business of banking, as contrasted to *possibilities* arising from theoretical postulates, this court, on review *de novo* in the manner directed by the Supreme Court in United States v. First City National Bank of Houston, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967), applying the standards prescribed by the Bank Merger Act of 1966 (12 U.S.C. § 1828(c) (5)), concludes that the merger of the defendant banks, Crocker-Anglo National Bank (here referred to as "Crocker") and Citizens National Bank (here referred to as "Citizens") was lawful and not in violation of the Bank Merger Act of 1966 (12 U.S.C. § 1828(c)), § 7 of the Clayton Act (15 U.S.C. § 18), or § 1 of the Sherman Act (15 U.S.C. § 1), and in support of this conclusion, finds:

1. That prior to and at the time of the merger, defendant banks were not in actual competition with each other in any economically significant section of the country;

2. That prior to and at the time of the merger, defendant banks were not in substantial potential competition with each other in any economically significant section of the country;

3. That the plaintiff has failed to prove by a preponderance of evidence that but for the merger Crocker would have branched *de novo* into the Los Angeles metropolitan area or any economically significant banking market in which Citizens operated;

4. That plaintiff has failed to prove by a preponderance of evidence that but for the merger Citizens would have branched *de novo* into the San Francisco Bay area or any economically significant banking market in which Crocker operated;

5. That the evidence shows affirmatively that in the instant case there is no reasonable probability that absent the merger Crocker would have established *de novo* branches in the Los Angeles metropolitan area or that Citizens would have established *de novo* branches in the San Francisco Bay area;

6. That the merger of defendant banks did not have a substantial adverse effect on actual or potential competition in the business of banking in any economically significant section of the country;

7. That given the desirability of establishing another statewide banking competitor to Bank of America National Trust and Savings Association (hereafter referred to as Bank of America), as conceded by plaintiff, the only economically feasible solution was and is the present merger; and

8. That even had a substantial lessening of competition occurred as a result of the merger of defendant banks, such anticompetitive effects were clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

## HISTORY OF THIS LITIGATION.

Before discussing the above stated conclusions of the court and findings in support thereof and such other findings as are appropriate and relevant to the court's decision, it would be well to review the history of this litigation to date and its relationship to the Bank Merger Act of 1966. Much of this history is set forth in the opinion of this court of October 6, 1966, when it stayed further proceedings in this cause and remanded the same to the Comptroller for further consideration in the manner indicated in the court's opinion. See United States v. Crocker-Anglo National Bank, 263 F.Supp. 125 (N.D.Calif.1966). We deem that history essential to a better understanding of this final decision on the merits. Rather than rely thereon by reference, the court, for convenience of the reader, and without the use of quotation marks, here repeats much of

what it then said, with such modifications as are needed to meet the *de novo* review directions of the Supreme Court in United States v. First City National Bank of Houston, supra.

On May 13, 1963, some 34 days prior to the decision of the United States Supreme Court in United States v. Philadelphia Nat. Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (June 17, 1963), the Crocker-Anglo National Bank of San Francisco and Citizens National Bank of Los Angeles applied to the Comptroller of the Currency for permission to merge, under the charter of the former, with the title "Crocker-Citizens National Bank". After notice and public hearing held July 30 and 31, 1963, and receipt of some 1605 pages of testimony and exhibits, the Comptroller, on September 30, 1963, made a decision approving the proposed merger, subject to certain named conditions, based on his findings, including the finding that the proposed merger would promote the public interest. The approval was to be effective on or after November 1, 1963. On October 8, 1963, this suit was filed attacking the proposed merger as unlawful under § 7 of the Clayton Act, (15 U.S.C. § 18) and § 1 of the Sherman Act, (15 U.S.C. § 1). A certificate under the Expediting Act (15 U.S.C. § 28) was filed and pursuant thereto a three judge court was named and assembled for the purpose of hearing the cause. The Government's application for a preliminary injunction was denied (United States v. Crocker Anglo Nat. Bank, D.C., 223 F. Supp. 849), and after completion of extensive pretrial proceedings and the making of a pretrial order, the cause came on for trial on the merits. The trial began June 1, 1965 and the taking of testimony was concluded on June 18, 1965, with orders fixing the time for filing of briefs and proposed findings by the parties.

While the court was thus in the process of hearing testimony, on June 11, 1965 the Senate passed, with no opposing vote, its S. 1698, a bill under whose provisions, if enacted, this case would have become moot, for, as stated in the report ac-

companying the bill, the bill "would free the banks involved in such suits from further proceedings under the antitrust laws." Whether it was because of their knowledge of the pendency of this legislation or otherwise, counsel by stipulation postponed the final filing of briefs and proposed findings until shortly before the passage of this proposed legislation, as amended in the House on February 9, 1966. The enactment, designated Public Law 89-356, 80 Stat. 7, was signed by the President on February 21, 1966.

The court was thus confronted with a somewhat extraordinary situation in which the law applicable to the case was changed after the testimony had been received and the cause submitted for decision. The measure, as finally enacted, made specific reference to this and other cases similarly situated in § 2(c) thereof, which provides as follows: "Any court having pending before it on or after the date of enactment of this Act any litigation initiated under the antitrust laws by the Attorney General after June 16, 1963, with respect to the merger, consolidation, acquisition of assets, or assumption of liabilities of an insured bank consummated after June 16, 1963, shall apply the substantive rule of law set forth in section 18(c) (5) of the Federal Deposit Insurance Act, as amended by this Act." [1] The so-called "substantive rule of law set forth in section 18(c) (5)" is stated in the Act as follows: "(5) The responsible agency shall not approve—

(A) any proposed merger transaction which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the responsible agency shall take into consideration the financial and managerial resources and future prospects of the existing and proposed institutions and the convenience and needs of the community to be served."

That language refers to the tests to be applied, in a case of this type, by the Comptroller of the Currency in passing upon an application for approval of a proposed bank merger. Not only did § 2 (c), quoted above, specifically direct that this court, in respect to this case, "shall apply the substantive rule of law set forth in section 18(c) (5)", but § 18(c) (7) (B) provided as follows: "In any judicial proceeding attacking a merger transaction approved under paragraph (5) on the ground that the merger transaction alone and of itself constituted a violation of any antitrust laws other than section 2 of the Act of July 2, 1890 (section 2 of the Sherman Anti-Trust Act, 15 U.S.C. 2), the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph (5)."

After a special hearing conducted for that purpose, evidence was received and the parties were granted time within which to file further briefs and memoranda expounding their views as to the action which the court should take in the light of the entire testimony and in view of the new enactment.

---

1. It was noted in the congressional debates that this section referred to three so-called "post Philadelphia cases—in Nashville, San Francisco and St. Louis—where mergers were consummated after that [Philadelphia] decision." This is the San Francisco case there referred to. The Philadelphia case referred to is United States v. Philadelphia Nat. Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915. In that connection reference was also made to United States v. First Nat. Bank and Trust Company of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1.

It is the Government's view that the new statute made no substantial change in the law or standards to be applied in passing upon the issues here presented. The Government puts it thus: "It is, of course, the essential position of the Government * * * that the 1966 amendment to the Bank Merger Act (P.L. 89–356; 80 Stat. 7) has not resulted in substantial change in substantive antitrust law *or in the standards used by the courts in determining the legality of bank mergers*." Specifically, the Government took the position that the language of § 18(c) (5) referring to "the convenience and needs of the community to be served" is but a reiteration of the "failing company doctrine" long recognized as an integral part of settled antitrust law.[2]

2. With this view we disagree. As the Supreme Court indicated in United States v. First City National Bank of Houston, supra, 386 U.S. at 369, 87 S.Ct. 1088, at best, all that one can say is that the *"failing company doctrine"* is *"related, though perhaps remotely"*, to the convenience and needs of the community to be served. In our view it would be absurd to find that new standards so carefully framed from the 1966 Bank Merger Act were no more than the inclusion of a wholly unnecessary reference to the failing company doctrine.

There is not the slightest indication in the language of the Act, or its legislative history, to support the Government's effort to thus cancel or dissipate the declared purpose of the Act. During the debate on the bill, the question of the situation of the failing bank was mentioned, and in a colloquy between Congressman Weltner, who opposed the bill, and Congressman Multer, who supported it, it was made plain that the language referred to was not limited to the failing bank situation. After Congressman Multer had given an illustration of how this language would apply in a case not involving a failing bank, the following colloquy occurred:

Mr. Weltner: This is a case of a failing bank, which has long been recognized by the court. It has nothing to do with this legislation. I am sure the gentleman from Wisconsin will agree with me, that we do not have to pass any bill to permit the approving agency to merge a failing bank in order to save it from insolvency. I am certain that the gentleman from New York, indeed, would say, as a well-educated lawyer, that the failing bank doctrine exists independently of any statutes which has been passed in the last 20 or 30 years. I yield to the gentleman for the purpose of responding to the correctness of that proposition.

Mr. Multer: The gentleman is correct as far as he goes, but I have gone beyond the failing bank theory. There are many instances where we are not concerned with the failing bank, where there is, an absolute and complete diminution of competition, yet under all the circumstances and all of the factors the courts should approve that merger just as the regulatory agencies may approve the merger." Cong.Rec. Feb. 8, 1966, p. 2346.

The careful and precise description of this portion of the bill, made by Senator Robertson to the Senate as the latter body prepared to accept the House version, would clearly negative any suggestion that it was limited to the failing company situation. He said: "* * * this bill, should convince the courts that the Congress does not intend that mergers in the banking field should be measured solely by the antitrust considerations which are applied in other industries." (Cong.Rec. Feb. 9, 1966, p. 2541.) In short, something apart from the older antitrust considerations, (including the failing company rule) are imported here. He also said (p. 2542): "The courts will no longer be able to say—in the case of a merger which does not reach to the point of creating a monopoly—that proof that a merger will have demonstrable benefits or will be benign is irrelevant. On the contrary, the question whether there are or are not demonstrable benefits—whether the merger is benign or malignant—will be the heart of the issue." Again he said (p. 2542): "The effect of the merger on the public interest and on the convenience and needs of the community to be served must be measured in specific and realistic terms in the light of the kinds of business involved and the kinds of people being served. The banking agencies and the courts must be guided by the realities of the industrial, commercial, and financial worlds. They must look through theories and percentages and doctrines to the hard facts of life."

A final answer to the Government's "failing company" theory is found in the House Report's indication as to the limited extent of the use of financial resources of the affected banks. That re-

■ We find no difficulty in concluding that the new enactment made substantial changes in the substantive law and in the standards to be applied in this case. Not only the language of the enactment, but its legislative history, is very compelling on this point. As we have noted, both § 2(c) and § 18(c) (7) (B), quoted above, specifically direct the court in this situation to apply the new standards of this Act. (The latter refers to the standards "directed to apply under paragraph 5" and § 2(c) and refers to these as "the substantive rule of law," set forth in that section.) It would be a bit startling to assume that in making this enactment, over which the congressional committees struggled long and hard, the Congress had turned up with nothing of substance, or had accomplished no change in respect to the law applicable for testing the validity of bank mergers.

The legislative history of the Act most emphatically contradicts the position now taken by the Government. The Senate Committee report, which accompanied the introduction of the bill in the Senate, took note of what Congress had contemplated would be the result of the Bank Merger Act of 1960. The Committee stated: "At that time it was clearly expected that the decision of the responsible Federal bank authority, based on its own investigation and on reports on competitive factors from the other two banking agencies and from the Department of Justice, would be final and conclusive. The Attorney General's report was expected to be advisory only." The report states that the uncertainty created by the situation resulting from the Philadelphia and the Lexington bank cases (supra, note 1) "is harmful to the banking industry and to its customers. * * * There was unanimous agreement by all the witnesses that the present situation was undesirable and should be changed."

The House Committee report states clearly the intent to make changes in the law as follows: "The intended legal effect of the bill is to modify the foregoing provision in three respects:

First, it is intended to make clear that no merger which would violate the anti-monopoly section (sec. 2) of the Sherman Anti-Trust Act may be approved under any circumstances.

Second, the bill acknowledges that the general principle of the antitrust laws—that substantially anticompetitive mergers are prohibited—applies to banks, but permits an exception in cases where it is clearly shown that a given merger is so beneficial to the convenience and needs of the community to be served—recognizing that effects outside the section of the country involved may be relevant to the capacity of the institution to meet the convenience and needs of the community to be served,—that it would be in the public interest to permit it.

Third, the bill provides that this rule of law is to be applied uniformly, in judicial proceedings as well as by the administrative agencies."

The most complete exposition of the congressional view in the process of this enactment is to be found in the remarks of Senator Robertson at the time the bill, as amended to conform to the House Committee report, came back to the Senate. At that time Senator Robertson, who was Chairman of the Senate Committee which had charge of the bill and who originally introduced the bill in the Senate, was recommending that the Senate accept the House amendment. No member of Congress had remained in closer touch with the bill's progress through both houses than Senator Robertson. As he put it: "I have lived with this problem day and night for months. I am convinced that we have a good bill." What he then had to say expounded at considerable length the ideas which had

port states (U.S.Code, Cong. and Administrative News, 89th Cong.2d Session, p. 1863): "However, only the convenience and needs of the community to be served can be weighed against anticompetitive effects, with financial and managerial resources being considered *only* as they throw light on the capacity of the existing and proposed institutions to serve the community." (Italics ours.)

been expressed by various House members during consideration of the bill in the House.[3]

Senator Robertson said unequivocally that the purpose of the bill was to "reverse a decision of the Supreme Court". He said (Cong.Rec. Feb. 9, 1966, p. 2538): "The bill will end the confusion and controversy which has surrounded the bank merger situation since the ill-advised and unfortunate decisions of the Supreme Court in the Philadelphia and Lexington cases and the district court decision in the New York case which followed those precedents. It will do this by establishing a uniform rule 'for the bank supervisory agencies and the courts to follow in bank merger cases: a rule which takes into account both the competitive factors on which the antitrust laws are based—for banks these

were written into the Bank Merger Act of 1960—and the convenience and needs of the public to be served by the proposed merged bank." Referring to the pendency of the suit now before us, he said: "It would permit the continuance of proceedings against the three 'post-Philadelphia' cases—in Nashville, San Francisco, and St. Louis—where mergers were consummated after that decision, but in these three cases the courts would be directed to follow the new statutory standards laid down in the statute for all mergers to be considered in the future." And in a prepared statement, which he incorporated in the record as a part of his remarks, he said of the bill: "It will strike the Philadelphia, Lexington, and New York decisions and opinions from the books." [4]

3. Representative Ashley, one of the members principally in charge of the bill in the House, stated (Cong.Rec. Feb. 8, 1966, p. 2339): "The bill would require the court to use the new standards of the bill in all * * * 'post Philadelphia' cases now pending in court. * * * The courts have repeatedly held that under the antitrust laws the social or economic benefits of a given merger cannot even be considered." The Congressman then quoted from the statement to that effect in the Philadelphia case: "It is a primary purpose of the bill to assure that the courts will never again dismiss as irrelevant the question of the needs of a community * * * [T]he merger must be shown to be sufficiently beneficial in meeting the needs of the community to be served that, on balance, it may properly be regarded as in the public interest."
During the same discussion Rep. Stanton, a member of the Committee in charge of the bill, stated (Cong.Rec. Feb. 8, 1966, p. 2343):
It was the expressed purpose and intent of Congress when it passed the Bank Merger Act in 1960 to make certain that control of bank mergers should be in the hands of the appropriate banking supervisory agencies, and that while the competitive effects of a proposed merger should be considered, they were not to be given a predominant position. These standards were repudiated by the Supreme Court in the Philadelphia National Bank and the Lexington Bank cases in

which the Court decided that the Justice Department had the final say in bank mergers. Contrary to the intent of Congress, the bank regulatory authorities were relegated to advisory roles.
These provisions * * * reinstate a measure of antitrust consideration which was lacking in the Senate bill, and they provide a banking standard that may allow economic assistance to a community even though 'a merger tends to lessen competition in that community. It is this statutory balance that was intended in 1960. * * *
The * * * bill * * * directs the courts to apply the banking standards as well as the competitive standards in any judicial proceeding attacking an approved merger transaction * * * it * * * gives these standards equal weight as between economic and competitive circumstances and it assures this equilibrium throughout the entire review procedure.

In an effort to find some legislative history to bolster its position that this Act made no changes in the law, the Government has inserted in its brief some quotations from the remarks of individual congressmen during floor debate. Taken out of context, as they are, they prove nothing. It is true that the wording of § 18(c) (5) emphasized and restated the requirement that the Comptroller, and the reviewing courts, take into consideration the antitrust laws. This was noted in debate, but it was also noted

Perhaps the most conclusive evidence of the fact that this Act alters the previous rules comes from a comparison of the language of this statute with what the Supreme Court said in the *Philadelphia* case, namely, that a bank merger such as that one "is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial." Section 18(c) (5), quoted above, expressly requires a consideration of similar factors thus rejected in *Philadelphia*.

■ This statute makes a further alteration in the nature of the proceeding now before us. After providing for the time of commencement of an action brought under the antitrust laws arising out of a merger transaction, § 18(c) (7) (A) stipulates: "In any such action, the court shall review *de novo* the issues presented." Returning now to the provisions of § 2(c), requiring this court to "apply the substantive rule of law set forth in, § 18(c) (5)", and to § 18(c) (7) (B), reciting that in any judicial proceeding attacking a merger transaction approved under paragraph 5, "the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph (5)," it seems clear that what we are now called upon to do is to review a

decision and determination of the Comptroller of the Currency.

This requirement that we apply the standards under paragraph 5 presented some difficulty, since the prior decision of the Comptroller of September 30, 1963, was not made under or in the light of the New Bank Merger Act of 1966.

It is true that the Comptroller then found that the proposed merger "will promote the public interest", using the language of the 1960 Act, but his determination did not contain findings covering the precise issues required to be determined by him under the language of § 18(c) (5) quoted above. Under that section it would be incumbent upon the Comptroller to determine whether any anticompetitive effects of the proposed merger were "clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." We apprehended that an appropriate finding should specify in what respect the transaction would meet the convenience and needs of the community to be served.

There is another respect in which the earlier finding of the Comptroller was inadequate and out-dated. His decision of September 30, 1963 antedated the decisions of the Supreme Court in United States v. El Paso Natural Gas Co., 376

that this Act definitely and positively added a new standard. As stated in the House Report of Supplemental views of Congressman Ottinger, who helped draft the bill: "It also assures that banking services available to meet the convenience and needs of a community are considered in all cases and will prevail where they clearly outweigh non-monopolistic anticompetitive effects of a merger." Counsel's quotations from the debate ignore the rule stated in Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474–475, 41 S.Ct. 172, 179, 65 L.Ed. 349, as follows:

By repeated decisions of this court it has come to be well established that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body. * * * But

reports of committees of House or Senate stand upon a more solid footing, and may be regarded as an exposition of the legislative intent in a case where otherwise the meaning of a statute is obscure. * * * And this has been extended to include explanatory statements in the nature of a supplemental report made by the committee member in charge of a bill in course of passage.

Counsel have largely confined their quotations to those from Congressmen Weltner and Todd, who opposed the bill, and from Congressman Patman, who bitterly fought the legislation, and finally, through a face-saving compromise, introduced the bill, while stating that if he alone were writing the bill, he "would be against it as a matter of principle." (Cong.Rec. Feb. 8, 1966, p. 2357.) Counsel's choice of makers of remarks is not very persuasive.

U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12, decided April 6, 1964, and United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775, decided June 22, 1964. In those cases the Supreme Court developed, to an extent not previously announced, the doctrine that § 7 of the Clayton Act is designed to preserve not merely present but potential competition in the market in question. This is the doctrine of the application of § 7 to potential competition. The principal argument made by the Government here relates to alleged elimination by the merger of *substantial potential competition* in the State of California.

Since the Act requires this court to proceed in this case in the same manner in which it would have to deal with some future proposed merger, we were of the view that before the court could perform the required function of reviewing the action of the Comptroller, the matter should be remanded for the consideration of the Comptroller under the provisions of the 1966 Act.

Plainly enough the Act is designed to set up precise rules under which the validity of proposed bank mergers may be ascertained and determined. The first required step is the application. to the Comptroller of the Currency [5] for written approval of the proposed merger. Upon hearing on such an application, the Comptroller is directed to act upon the considerations set forth in § 18(c) (5) above referred to. Then, as indicated, if an action be brought attacking the merger transaction, it must be brought within a limited time and in any such

action "the court shall review *de novo* the issues presented." Thus the Act contemplates initial action by the Comptroller, followed by a review at the instance of the Department of Justice.

When we first faced the task of complying with these requirements, we were confronted with a difficulty arising out of the fact that the Act provides that this review shall be *"de novo"*.

It will be noted that under par. (5) the Comptroller is charged with ascertaining two sets of facts. The first is whether the effect of the proposed merger transaction "in any section of the country may be substantially to lessen competition", and the second, whether, having found that there would be anticompetitive effects in the proposed transaction, those effects "are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served."

We found no difficulty in reviewing *de novo* the first of these determinations, for this court has traditionally adjudged whether mergers have anticompetitive effects. But on the problem of reviewing the second determination by the Comptroller, namely, whether the proposed transaction is clearly outweighed in the public interest, and whether it meets the convenience and needs of the community to be served, we were originally of the view that this is a legislative or administrative determination of a type which this court, as a constitutional court, is prohibited from deciding.[6] We found an expression of this view in the

---

5. It is this officer who must act if the acquiring, assuming or resulting bank is to be a national bank. Where a state bank is to be the resulting one, the decision is to be made by the Board of Governors of the Federal Reserve System. In other cases, the Federal Deposit Insurance Corporation is to make the decision.

6. In that connection we said:
 It will be noticed that the standards of § 5 are to be applied in granting or refusing leave to merge in the future. The contemplated action "looks to the future and changes existing conditions by making a new rule, to be

applied thereafter to * * * some part of those subject to [the Comptroller's] power," as fully as the establishment of railroad rates in Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150. It involves a determination and establishment of a public policy.

See Finfrock, "Trial de Novo—Panacea?" in Baylor Law Review, 135, where the Texas cases are discussed: "This criterion in essence classifies as administrative and non-judicial decisional functions which courts are not particularly equipped to decide while leaving to the courts that category of

words of the Supreme Court in the following quotation from United States v. Philadelphia Nat. Bank, supra, 374 U.S. at 371, 83 S.Ct. at 1745 which we have italicized:

> We are clear, however, that a merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. *A value choice of such magnitude is beyond the ordinary limits of judicial competence,* and in any event has been made for us already, by Congress when it enacted the amended § 7. Congress determined to preserve our traditionally competitive economy.

This initial difficulty on the problem of reviewing the second determination of the Comptroller has since been dissipated. It is now established that the previously held view of this court must be modified, for the Supreme Court, in passing upon the very standards here involved in United States v. First City National Bank of Houston, supra 386 U.S. at 369–370, 87 S.Ct. at 1093, said:

> *The courts may find the Comptroller's reasons persuasive or well nigh conclusive. But it is the court's judgment, not the Comptroller's, that finally determines whether the merger is legal.* That was the practice prior to the 1966 Act; and we cannot find a purpose on the part of Congress to change the rule. This conclusion does not raise serious constitutional questions by making the courts perform nonjudicial tasks. The "rule of reason", long prevalent in the antitrust field (see, e. g., Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683), has been administered by the courts. A deter-

mination of the effect on competition within the meaning of § 7 of the Clayton Act is a familiar judicial task. *The area of "the convenience and needs of the community to be served," now in focus as part of the defense under the 1966 Act, is related, though perhaps remotely, to the failing-company doctrine, long known to the courts in antitrust merger cases.* United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176. The appraisal of competitive factors is grist for the antitrust mill. See, e.g., United States v. Philadelphia National Bank, supra, 374 U.S. 357–367, 83 S.Ct. 1738–1743. The courts are not left at large as planning agencies. The effect on competition is the standard; and it is a familiar one. If the anticompetitive effect is adverse, then it is to be excused only if "the convenience and needs of the community to be served" *clearly* outweigh it. *We see no problems in bringing these standards into the area of judicial competence.* There are no constitutional problems here not present in the "rule of reason" cases. (Footnotes omitted.) (Italics ours.)

Not having had the benefit of the recent above quoted ruling of the Supreme Court and feeling as we did that a determination of "the convenience and needs of the community to be served" was an administrative, rather than a judicial function, we remanded the cause to the Comptroller with directions to proceed to make the determinations called for by the Bank Merger Act of 1966.

It is well that we did so, for as the Supreme Court said in the above quotation, while on review *de novo,* "it is the court's judgment, not the Comptroller's that finally determines whether the merger is legal", yet, in so determining,

decision making with which it has traditionally dealt and is equipped to handle under the adversary type of judicial procedure. Decisions that require the inquisitorial type of procedure, investigative in nature, and which must, to attain optimum utility, be based upon a mosaic of expert opinion, judgment, and decisions are and

should be regarded as non-judicial and left primarily to the administrators. They are far more able to come to grips with such problems than a court or jury in the detached and sterile atmosphere of the court room." (p. 160). United States v. Crocker-Anglo National Bank, D.C., 263 F.Supp. 125, 132, footnote 5.

"the courts may find the Comptroller's reasons persuasive or well nigh conclusive."

On remanding the cause to the Comptroller, we suggested that he should make specific findings as to:

1. The competitive situation as to which the merger may have operative effects and particularly whether the merger will have a probable tendency to lessen or do away with competition; and

2. The probable effect of the transaction in meeting the convenience and needs of the community to be served. In this latter connection we suggested that he specify particularly what he finds to be the convenience and needs of the community, what he considers will be the effect of the merger thereon, and how and by what means he weighs these effects as against the anticompetitive effects of the transaction.

Finally, in order to avoid any possible necessity for further remand following our review of the Comptroller's order, he was directed to make findings as to whether, assuming that the merger has the effect upon potential competition which the Government claims, that effect would be clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.[7]

Following the remand and after due notice to all interested parties, including the Attorney General of the United States,[8] the matter was further heard by the Comptroller on November 14, 1966, at which time he not only reviewed the record of the hearing on which he based the findings contained in his decision of September 30, 1963, but also all the material already introduced in evidence before this court in the course of its previous trial and rehearing of this case and additional information available to and presented by the Comptroller in the course of said hearing of November 14, 1966. The hearings of the Comptroller on this merger were probably the most extensive ever held on a bank merger. Had the Attorney General participated, it would have been an adversary proceeding equivalent to that before any administrative agency or the courts.

In the extensive findings and conclusions of law filed by the current Comptroller with this court on December 27, 1966, which this court finds from the evidence presented in this case on review de novo to be correct, he reaffirmed the judgment of his predecessor. Further hearings had been held in this court on April 19, 20, and 21, 1966, and following the filing of briefs and a limited hearing on February 3, 1967, to consider the findings of the current Comptroller, the cause was ordered submitted. However, because of the pending appeal in the case of United States v. First City National Bank of Houston, supra, relating to the nature of the review de novo and the burden of proof on "the convenience and needs of the community to be served", this court deferred any ruling on the merits to await the decision of the Supreme Court, which was entered on March 27, 1967.

With the previous history of this litigation and its relationship to the Bank Merger Act of 1966 in mind and behind us, we are prepared to decide this cause on the merits.

Before discussing the merits of the issues presented, a review of the history and operations of the defendant banks, the negotiations leading to the merger and the role of Transamerica Corporation therein, and the hard facts as to

7. Note the usefulness of findings based on assumptions made by the district court in United States v. Philadelphia Nat. Bank, supra, 374 U.S. at p. 335, 83 S.Ct. 1715.

8. The head of the Antitrust Division of the Department of Justice in a letter to the Comptroller on November 10, 1966, took the position that "There is thus no provision for an administrative hearing by your [Comptroller's] office nor are there any standards prescribed for such a hearing", and since the court must determine de novo the legality of the merger, the Department of Justice saw no need for plaintiff to appear at the Comptroller's hearing. (BK–PPP)

the nature of the business and banking in California would be helpful.

## HISTORY AND OPERATIONS OF DEFENDANT BANKS.

Defendant Crocker-Anglo National Bank, prior to November 1, 1963, was a banking association organized under the laws of the United States, with its principal place of business at San Francisco, California.

Defendant Citizens National Bank, prior to November 1, 1963, was a banking association organized under the laws of the United States, with its principal place of business at Los Angeles, California.

Transamerica Corporation (herein referred to as "Transamerica") is a holding company incorporated under the laws of Delaware, with its principal place of business at San Francisco, California. At the time of the merger Transamerica owned approximately forty-one per cent of the capital stock of Citizens, and, as a result of the merger, it received approximately 12 per cent of the stock of Crocker-Citizens National Bank (herein referred to as "Crocker-Citizens"), the title given to the new bank under the charter of Crocker. Transamerica's ownership in Citizens, which it voted in its entirety in favor of the merger, was sufficient to give it the power to prevent any merger of Citizens with any other bank. In addition to its holdings in Citizens (now in Crocker-Citizens), Transamerica holds stock in a substantial number of insurance companies, public utilities, industrial corporations and to a limited degree in Western Bancorporation, a holding company with subsidiary banks located throughout the western states, and Bank of America. These latter two holdings made for investment purposes, the court finds to be insufficient to have any appreciable effect on banking operations in any area relevant to this case.

■ Crocker and Citizens were each engaged in interstate commerce. The merger of Crocker and Citizens was not a merger of necessity because of management problems or earnings, or any of the things that make a merger compelling in

that respect. While both were progressive banks with a substantial future as separate institutions and while both were expanding their branching facilities within their respective areas of operation, up to the time of the merger, with the exception of Ventura County, California, where their operations were too minor to adversely affect competition in this presumed local banking market, neither bank had branched into or otherwise made any economically significant entry into the banking market of the other. The evidence, as will be hereinafter disclosed, is clearly insufficient to support a reasonable inference that either intended to, or that it was feasible for either to, enter the market of the other in the reasonably foreseeable future.

Crocker-Anglo was chartered in 1870. It was the fifth largest commercial bank in California and sixteenth largest in the United States in terms of deposits. It conducted a general commercial banking and trust business through 124 banking offices located in 29 California counties ranging from the California-Oregon boundary on the north to Santa Barbara County in the south. As of December 28, 1962, Crocker-Anglo had total deposits of about $2,134,002,000, total assets of about $2,360,014,000, and total loans and discounts of about $1,219,050,-000.

Citizens was originally incorporated in 1890 under the laws of California; it received a national bank charter in 1901. Citizens was the eighth largest commercial bank in California and forty-third largest in the United States in terms of deposits. It conducted a general commercial banking and trust business through 78 banking offices located in Los Angeles, Orange, San Bernardino, Riverside, and Ventura counties. As of December 28, 1962, it had total deposits of about $713,793,000, total assets of about $791,662,000, and total loans and discounts of about $357,099,000.

A map showing the locations of the banking offices of each of the merging banks in California immediately prior to the merger can be found in the court's

opinion in United States v. Crocker-Anglo National Bank, D.C., 223 F.Supp. 849, 851.

On February 10, 1956, Crocker First National Bank of San Francisco (herein "Crocker First National") and Anglo California National Bank (herein "Anglo California") consolidated under the name of Crocker-Anglo National Bank, combining the 47 offices of Anglo California located in 31 communities with the 3 offices of Crocker First located in San Francisco, Oakland and San Mateo. Anglo California also had offices in San Francisco and Oakland. Immediately prior to said consolidation Crocker First National had total deposits of about $430,488,000 and total loans of about $214,201,000, and Anglo California had total deposits of about $844,839,000 and total loans of about $440,461,000. On June 30, 1956, Crocker-Anglo National Bank offices located in San Francisco had 24.8 per cent of the total IPC (individual, partnerships and corporations) demand deposits in that City and County.

On June 22, 1956, Crocker merged with the First National Bank of Scotia and with the First National Bank in Madera. On September 7, 1956, Crocker merged with Salinas National Bank. On May 29, 1959, Crocker merged with County National Bank and Trust Company of Santa Barbara. On September 25, 1959, Crocker merged with The Bank of Carmel and with The First National Bank of Monterey, and with The First National Bank of Pacific Grove. On June 23, 1961, Crocker merged with the Bank of San Rafael and with the First National Bank in San Rafael.[9]

On November 30, 1959, Citizens merged with the Bank of Whittier and with the First National Bank of Vernon. On December 7, 1962, Citizens merged with the Glendora Commercial and Savings Bank.

The nine banks acquired by Crocker from June 1956 to June 1961 had, combined, deposits of about $164,371,000, loans of $79,790,000, and 20 banking offices. The three banks acquired by Citizens from November 1959 to December 1962 had, combined, about $19,977,000 in deposits, $8,880,000 in loans, and 6 banking offices. All of these banks were engaged in interstate commerce.

## NEGOTIATIONS LEADING TO THE MERGER.

The purpose of creating another statewide bank to compete with Bank of America [10] was clearly stated when the subject of the merger of Crocker and Citizens was first proposed. (Tr. 1021). In September 1958, L. O. Ivey, vice chairman of the board of Citizens National Bank and its second largest stockholder, approached Paul Hoover, president of Crocker, with regard to a merger of the two banks for the purpose of forming another statewide institution. (Tr. 1020, line 21–Tr. 1021, line 10; Tr. 1029). L. O. Ivey had no connection with Transamerica. (Tr. 1031). Although the management of Citizens may not have been favorably disposed to this proposal, Ivey interested Transamerica in the negotiations, but they came to an abrupt termination in March 1959, when Transamerica, as the dominant stockholder of Citizens, demanded too high an exchange ratio for the Citizens stock (Tr. 1022, 1029–1030). Although it appeared at this time that there was no possibility of merging Crocker with Citizens and although every reason now urged by plaintiff for entering Los Angeles then existed, *Crocker took no steps and made no plans to establish offices in Los Angeles or any of the other southern counties,*

---

9. Even though this court can no longer order a divestiture of Crocker's prior merger of these banks, it does not follow that this court may not consider these prior mergers in its evaluation of the expansion trend of Crocker and any bearing they may have on the question of whether but for the instant merger Crocker would have branched *de novo* into the banking market of Citizens.

10. Bank of America, described by Mr. Ivey as "the octopus", is more commonly known in financial circles as "the Colossus of the West" and is the largest bank in America and the largest private bank in the world.

either by merger or by *de novo* branching.

JUDGE POPE: I would like to ask this question: Was there any time subsequent to 1956 when the officers of ˌyour organization discussed the problem of establishing branch banks in the Los Angeles area? By that, I mean Los Angeles County, Orange County and vicinity.

THE WITNESS: Yes, the subject came up quite frequently, Your Honor, and was cast aside because we just didn't have the horses, we didn't have the capital, we just couldn't do it and we didn't have the personnel.

JUDGE POPE: Was this at a time when you were generally agreed that it would be desirable to enter—

THE WITNESS: It was indeed.

JUDGE POPE: To enter the Los Angeles area?

THE WITNESS: Yes.

(Hoover, Tr. 1038, Lines 5–19).

In January 1962, two years and nine months later, Paul Hoover and Emmett Solomon, then chairman of the board and president, respectively, of Crocker, called on John R. Beckett, the new president of Transamerica, to discuss the possibility of merger with Citizens. At that time they were informed by Beckett that Transamerica was not interested in such a move, but that if it did become interested, he would so advise Crocker (Solomon, G–337, pp. 109–110). Prior thereto, Transamerica, for reasons relating to the accounting rules of the Securities & Exchange Commission, was interested in owning more than 50 per cent of Citizens, in order that it might thereby substantially increase its earnings (Beckett, Tr. 1908). Subsequently and at the meeting of its board of directors on August 31, 1962, Transamerica, fearing that its 41 per cent holding in Citizens might result in Transamerica voting more than 50 per cent of the stock of Citizens represented at an annual meeting and thereby subject it and all of its subsidiaries wherever located in the world to examination by the Federal Reserve Board at the expense of the company, decided to dispose of its Citizens holdings and instructed Mr. Beckett to see what he could do in this regard (Beckett, Tr. 1910–1913).

Pursuant to such instruction in September 1962, Beckett informed Hoover or Solomon or both that Transamerica had decided that it would be interested in a merger because Transamerica was leaning in the direction of becoming a mutual fund type operation (Solomon, G–337, p. 110; Beckett, Tr. 1913). In response to this, Hoover and Solomon negotiated with Transamerica for the purpose of determining what exchange ratio would be satisfactory to Transamerica in the event a merger was successfully negotiated with Citizens. Transamerica agreed that an exchange ratio of 1.8 shares of Crocker to 1 share of Citizens would be satisfactory to it (Solomon, G–337, pp. 125–126). Transamerica also agreed that it would not interfere with the management of the resulting bank and that it would dispose of its shares in the resulting bank on an orderly basis (Solomon, G–337, pp. 127–128). Transamerica thereafter informed the executive committee of Citizens of Crocker's proposal and that Transamerica was in favor of it (Britt, G–334, pp. 10–12a). Hoover and Solomon then negotiated with the management of Citizens, not only as to the exchange ratio, but as to all other aspects of the merger agreement which were important to both groups (Britt, G–334, p. 12b; Solomon, G–337, pp. 124–125). Included were the composition of the board, adjustment of principal officers, employee benefits, location of directors' meetings, name of the combined bank, composition of the executive committee, functions of the advisory committees, location of the bank's headquarters and the multitude of other things, any one of which might have prevented agreement on a merger (Solomon, G–337, pp. 124–127; Clarke, Tr. 1246, line 18–Tr. 1247, line 17). Finally, by a letter from the chairman of the board of directors of Crocker, dated February 6, 1963, Crocker-Anglo offered to merge at an exchange ratio of 1.9 shares of Crocker-

Anglo to 1 share of Citizens. (Britt, G–334, pp. 22–24). The proposal also contained various provisions relating to the liabilities of the two banks, the composition of the board of directors of the resulting bank, future employment and pensions of employees of both banks (Ct. Exh. 195).

In February 1963, the boards of directors of both banks approved the merger in principle and authorized and directed the officers to negotiate a definitive agreement. On February 28, 1963, Crocker initiated an examination of Citizens and discovered the possibility of exposure to liability from a certain action pending against Citizens. Being unwilling to assume, through a merger with Citizens, responsibility for that litigation and for related contingent liabilities in connection therewith unless indemnified, Crocker entered into an agreement with Transamerica whereby Transamerica, together with its subsidiaries, agreed to indemnify and save harmless Crocker against any and all liabilities which might arise from that action, to the extent of 60 per cent thereof. Thereafter Crocker confirmed its offer by a letter dated April 1, 1963, from the chairman of its board. In April, the board of directors of each authorized the execution of the formal agreement to merge and it was duly executed (Ct. Exh. 195, "Application for Approval of Merger", p. 4).

On May 3, 1963, the two banks submitted their Application for Approval to Merge under section 18(c) of the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1828(c), and section 215a of Title 12 U.S.C., to the Comptroller of the Currency (Ct. Exh. 195).

Pursuant to notice, the Comptroller of the Currency held a public hearing on the proposed merger on July 30 and 31, 1963. The record developed at the hearing comprises 1,605 pages of testimony and exhibits (BK–A). On September 30, 1963, the Comptroller of the Currency rendered his decision approving the merger subject to the conditions that the board of directors of Transamerica agree: (1)

that no more than one director or officer or other representative of Transamerica Corporation will serve as a director of the resulting bank, and (2) that it would dispose of substantially all of its stock holdings in the resulting bank by December 31, 1966. Subsequently, this provision was further changed by putting the stock in a voting trust, over which Transamerica has no control. Transamerica no longer has a director on the combined board, and the percentage of the stock it now holds under the voting trust has been reduced from 12 per cent to 8.8 per cent. The trust, which cannot be altered without approval of the Comptroller, is presumably to remain in effect until Transamerica can make a fair and equitable disposition (sale) of its holdings. The influence of Transamerica on the banking operations of the old Citizens or the new Crocker-Citizens has thus been effectively removed.

In his decision approving the merger, the Comptroller found favorably to the banks on all the banking factors involved and also found that the proposed merger would have no adverse effects on competition, that it would not tend toward monopoly, and that it would not violate section 7 of the Clayton Act (BK–A).

On October 8, 1963, this action was commenced and the Government moved for a preliminary injunction restraining the consummation of the merger. After hearing, the Government's motion for a preliminary injunction was denied (United States v. Crocker-Anglo Nat. Bank, 223 F.Supp. 849 (N.D.Calif.1963)), and the merger was consummated on November 1, 1963. The subsequent history of this litigation has already been recited above.

THE NATURE OF BANKING IN CALIFORNIA AND THE ECONOMIC MILIEU IN WHICH IT OPERATES.

In view of the broad geographic distribution of the operations of the merging banks and their branches in order to better assess and render a balanced judgment on the impact of this merger, a

review of the economic milieu in which they operated is imperative.

The geographic expanse of California, comprising 158,693 square miles of land with some 800 miles of coastline and an average width of 200 miles, with all the attendant problems created by distance, can best be appreciated if its area is transported to the east coast and overlaid on the eastern seaboard. When the north-south California axis is placed on the north-south axis of the east coast, the California overlay extends from Boston, Massachusetts on the north to Charleston, South Carolina on the south. Encompassed in this area we will find all the land area of Connecticut, Rhode Island, New Jersey and Delaware and the eastern half of Massachusetts, Pennsylvania, Maryland, Virginia, North Carolina and South Carolina. It would embrace such cities as Boston, New York, New Haven, Wilmington, Philadelphia, Baltimore, Washington, D. C., Richmond, Norfolk, Charlotte, Winston-Salem and Charleston.[11]

It has a topography and climate probably unmatched throughout the remain-

11. On the characteristics of California's economy, Professor Weston testified:

Q. Are there any factors regarding the characteristics of particular areas of California's economy that you deem significant?

A. Yes. Again, it is well known that California is characterized by the two highly urbanized areas, the Bay Area and the L.A. area. Then in between, the North Coast area, lumber, fishing, the mountain area, the agricultural areas, the desert areas.

So that you have a great diversity in regional economic characteristics in California.

Q. And what significance did that have with regard to the instant merger?

A. This has a significance that a branching system is able to help mobilize the financial resources of the State more effectively. It can gather deposits in areas that generate deposits and use them in loans in areas that are growing rapidly, where loans are needed.

And this is particularly significant for a capital deficit area, such as California, that imports capital, because it enables the branch system to more effectively utilize the financial resources of the State.

Q. In considering—

JUDGE ZIRPOLI: Would this be a factor which indicates that there is such a thing as a statewide market?

THE WITNESS: No. It indicates that where you have branching in an area with diverse economic characteristics, that you get benefits basically of diversification both on the deposit side and on the lending side. (Tr. 1486–1487)

JUDGE ZIRPOLI: But you have just indicated that there is a possibility of an intake at one section of the State and an outgo at another section.

THE WITNESS: That is true.

JUDGE ZIRPOLI: Yes. Doesn't this give it a statewide characteristic?

THE WITNESS: Insofar as you have statewide branching, the extent to which this activity of gathering by commercial banks and lending out in another place is restricted by law to a state area.

But insurance companies, for example, can gather in the diverse areas of California and take the money out of California. Legally they do.

Since California is a capital deficit area, insurance companies tend to do the opposite. They gather funds in other parts of the country and lend them out in California.

The fact that this commercial banking activity is co-terminus with the political boundaries of the State of California is not determined on economic grounds; it is determined on the grounds that statewide branching is the limit of the extent to which this branching can take place.

MR. ZIRPOLI: All right.

THE WITNESS: One other aspect of this is that again on the lending side the larger California banks in the national bank division do send their men out to talk to customers in other parts of the country, but again as a practical matter, to try to handle their California business, although if—again, if California were not a capital deficit area these national banking division people might well be trying to make loans to firms in New York just as the New York banks and Chicago banks make loans in California.

So that from an economic standpoint there is not a statewide commercial banking activity. (Tr. 1488–1489)

der of the United States for its complexity and variety and thus accounts for the extraordinary expansion, growth and diversity in population, agriculture, business and industry, which for decades have made and continue to cause *California to be a substantial capital import state* (Saxon, Tr. 2066–2068). This situation, which is recognized by all the parties, is of paramount importance in any consideration of the State of California as a whole as a relevant economic section of the country in which to evaluate the competitive nature of commercial banking (the term used in the Bank Merger Act of 1966 is "the business of banking"). It is also important to the court's consideration of the convenience and needs of the community to be served.

Any attempt to divorce the entire State of California from the national market (as a submarket thereof) in assessing the anticompetitive impact of this merger by the use of concentration figures in commercial banking based upon the number of offices, assets, IPC deposits and loans of California banks alone (as plaintiff would have us do) and without consideration of other financial forces in and out of California which come into play and compete with such banks for the very financial services that may cause the entire state to be a relevant market (as contrasted to those which are basically local) is an oversimplification, an oversimplification which might make the court's task easier, but which would ignore a substantial and essential part of the picture and would result in a false portrayal of the hard economic facts of banking in this assumed state market. As difficult as the task may be, ours is the obligation to clarify and establish the picture with certainty.[12]

## THE APPROPRIATE LINE OF COMMERCE TEST.

 While it is well established that commercial banking, which has as one of its *prime characteristics the fact that commercial banks are the only financial institutions that can accept demand deposits*,[13] is an appropriate line of commerce within which to measure the an-

12. From our experience in this and other cases involving regulatory agencies, we agree with the observation of District Judge McMahan in United States v. Manufacturers Hanover Trust Co., 240 F. Supp. 867, 881 (S.D.N.Y.1965), that:

We think that if ever there were a field requiring administrative expertise to unravel the tangled threads of the evidence and weave them into a meaningful fabric, this is it. This case involves a multitude of technical, intricate and complex problems in the field of money and banking, a subject within the special competence of the Board [Comptroller] and outside the conventional experience of judges.

We further agree with the suggestion of Mr. Justice Harlan (dissenting) in United States v. El Paso Natural Gas Co., 376 U.S. 651, 664, 84 S.Ct. 1044, 1051, 12 L.Ed.2d 12 (1964), that this "duplicative * * * anachronistic system of dual regulation should be re-examined."

13. Check writing, as the most convenient way of paying debts, and the department-store-of-finance characteristics of local banks, are the basic items of convenience that make commercial banking an appropriate line of commerce in the local mar-

ket. The growth of the demand deposit activity of commercial banks has lagged behind the growth of the economy as a whole. During the postwar years the economy, as measured by gross national product, has grown at a rate three or four times the growth rate of demand deposits (Weston, Tr. 1469–1470), and according to some experts, the activities of noncommercial bank financial intermediaries, have served as effective economic substitutes for the use of demand deposits (Weston, Tr. 1471). Checking accounts are sort of a loss leader. In fact, the total operating income of California commercial banks from demand deposit service charges is less than $\frac{1}{20}$th of 1% of their total operating revenue (Weston, Tr. 1474).

As a matter of practical experience, time deposits in a savings and loan association of commercial bank are the equivalent of demand deposits in that both are paid on demand (Dirlam, Tr. 557–558). The only practical difference between a demand deposit in a commercial bank and a time deposit in commercial banks and savings and loan associations relates to the procedure by which those deposits are withdrawn. In the case of a demand deposit in a com-

ticompetitive effects of a banking merger in local markets, it does not necessarily follow under the 1966 Act that the *totality of financial activities* carried on by *commercial banks* and *their competition* in a statewide market of the magnitude of California or in the national market [14] should be ignored. It is not the view of this court that in such expanded markets commercial banking is the sole line of commerce that the court can or should consider. Hence, what we are about to say, which represents the views of the members of this court, while not essential to the findings herein made and the conclusions herein reached, is, nevertheless, clearly applicable to this case and the substantive standards by which bank mergers are to be tested under the Bank Merger Act of 1966.

In fact, the provisions and terminology of subparagraphs (A) and (B) of the Bank Merger Act of 1966, § 1828(c)(5) of Title 12 U.S.C., which set forth the substantive standards by which banking mergers are to be judged, suggest to this court that a broader test was intended and now applies. We deem the deliberate omission from the Bank Merger Act of 1966, § 1828(c)(5)(B), of the phrase "in any line of commerce" is not without significance.[15]

Plaintiff argues that "it was quite unnecessary, and indeed would have been inappropriate, for the phrase 'in *any* line of commerce' to have been included in so obviously a statute concerned exclusively with banks. To have had it there would have been out of place and would

---

mercial bank, the procedure consists in the use of checks, whereas with a savings and loan or time deposit, the intervening procedure consists in presenting the necessary documents at the place of deposit (Dirlam, Tr. 558–559).

If there is an advantage to commercial banks by reason of their ability to offer the unique function or service of checking accounts, the advantage is their ability to use that function as a sort of loss leader to get the customer into the bank for the purpose of selling him some other service, for which there is fierce competition with other financial institutions (Weston, Tr. 1597). While they are the only institutions which have the benefit of that loss leader, there was no evidence that this advantage would enable a commercial bank in one section of the state to be able to successfully compete with other financial institutions located in a distant community for the business of a customer located there.

14. In making this observation we are not unmindful of the decision in *Manufacturers Hanover*, supra, that "commercial banking" is an appropriate line of commerce, even though a geographic market as extensive as the entire nation may be involved. However, we feel that the expanded "section of the country" considerations we urge herein are essential to a true evaluation of a bank merger in a section of the country of the magnitude of the whole of California, and it is up to us to clarify any confusion Government's counsel feel will arise in the application of these considerations.

15. The significance of the omission of this phrase so essential to § 7 of the Clayton Act was not decided by the Supreme Court of the United States in United States v. First City Nat. Bank of Houston, supra. In footnote 1, 386 U.S. at page 369, 87 S.Ct. at page 1094, the Court said:

12 U.S.C. § 1828(c)(5)(B) provides, as we have seen, that a merger shall not be approved "whose effect in any section of the country may be substantially to lessen competition." It is pointed out that that standard omits the phrase "in any line of commerce" which is present in § 7 of the Clayton Act. It is argued that Congress meant that commercial banking is no longer to be considered as an area of effective competition and that the Act establishes in banking "a market test measurable only by larger commercial realities".

We do not reach this question and we intimate no opinion on it nor any views on the merits of these mergers or on the justifications that are urged in their support. All questions except the procedural ones treated in the opinion are reserved.

This court, however, if it is to provide a vehicle for finality on all the questions presented by the instant merger, must resolve this question, even though for alternative reasons hereinafter stated, such resolution of the question might prove not to have been necessary.

not have made sense". (Plaintiff's Supp. Post Reply Brief, p. 12A.)

■ This argument ignores the canons of statutory construction that " * * * the legislative language will be interpreted on the assumption * * * that if change occurs in legislative language, a change was intended in legislative result." [16] Furthermore, the statute itself answers plaintiff's argument. Subparagraph 5(A) immediately preceding subparagraph 5(B) provides the first substantive test for bank mergers. It is in terms of monopoly. It refers expressly to "the business of banking". Congress obviously thought it "made sense" and was not "out of place" to use the words "business of banking" when formulating the monopoly test. In the following paragraph Congress just as obviously must have thought it "made sense" to omit those words. This gives all the more credence to Senator Robertson's statement that Congress intentionally omitted "any line of commerce" (as well as "business of banking") from subparagraph 5 (B) of the amendment, in order to provide a less stringent test. In his remarks on the floor of the Senate when he presented the amendments of the House of Representatives to S. 1698, the bank merger bill, Senator Robertson said:

> It will be noted that the prohibitory language is based generally on the terms of section 1 of the Sherman Act and section 7 of the Clayton Act. Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits contracts, combinations, and conspiracies "in restraint of trade or commerce" while section 7 of the Clayton Act (15 U.S.C. § 18), as amended in 1950, prohibits acquisitions "where in any line of commerce in any section of the country the effect may be substantially to lessen competition, or to tend to create a monopoly."

> The text of paragraph (B) of the new bill follows the terms of section 1 of the Sherman Act and section 7 of the Clayton Act, with the exception that

the reference to "any line of commerce" in the Clayton Act is not carried over into the new bill. In this respect the new bill resembles the Bank Merger Act of 1960, and calls for an appraisal of the overall effects of the merger on competition, weighing increases of competition in one field against decreases in competition in another field. The banking agencies and the courts, in other words, are not intended and are not permitted to select some single, perhaps minor aspect of the banks' business and to say that, because there is some lessening of competition in this element of the business, the overall effects of the merger—the increase of competition in the entire field of banking and in the broader field of financial institutions which may result from other aspects of the merger—are irrelevant and may not be considered.

As the Banking and Currency Committee said in 1959 in reporting out the Bank Merger Act of 1960, we do not want the banking agencies and the courts to say as did Judge Weinfeld in the Bethlehem-Youngstown merger, "If the merger offends the statute in any relevant market then good motives and even demonstrable benefits are irrelevant and afford no defense." (U. S. A. v. Bethlehem Steel Corp. et al., D.C., 168 F.Supp. 576, 1958; see Senate Report No. 196, 86th Cong., S. 1062, pp. 5–6.)

We do not want the court to say, as it did in the Philadelphia case, that a merger which may substantially lessen competition in one line of business in one section of the country "is not saved because, on some ultimate reckoning of social debits and credits, it may be deemed beneficial." We do not want the court to apply a statute which, in the words of the court in the Philadelphia case, proscribes "anticompetitive mergers, the benign and the malignant alike." (Hearings on S. 1698, p. 403). In considering whether a proposed

---

16. Sutherland Statutory Construction, Section 4510, 3rd Edition, Horach.

merger may lessen competition or tend to create a monopoly or be in restraint of trade, the banking agencies and the courts will, of course, take into consideration all the facts which I have discussed under the question of monopoly —the competition from other financial institutions in one or another part of its business, the competition from other banks and other financial institutions, locally, regionally, nationally and internationally, the inevitable limitations on competition imposed by statute and by regulatory authorities, with respect to entry into the business and with respect to the carrying on of the business. All of these factors must be taken into consideration in weighing the overall anticompetitive effects of the proposed merger. (Cong.Rec. Feb. 9, 1966, p. 2541–2.)

And Congressman Ashley, as house manager for S. 1698, in reporting out his version of that bill, commented on the problem as follows:

The Committee recognized that commercial banks face intensive competition from other financial institutions— savings and loan associations, mutual savings banks, insurance companies, finance companies, and so forth. The Committee also recognized that competition between commercial banks and other institutions includes local competition, regional competition, national competition and even international competition for one part or another of the business. To overlook any one of these aspects of competition, or to concentrate on one of them to the exclusion of the others, would be unrealistic and might well diminish, not increase, financial competition.[17]

■ In interpreting the Bank Merger Act of 1966 as it was finally enacted,

plaintiff urges the court to listen only to the words of Representative Patman and his associate, Representative Reuss, who, plaintiff proposes "are the principal architects" of the legislation. Yet, anyone reading the legislative history of the Act cannot help but conclude that the language of Senator Robertson and Representative Ashley more properly defines the scope and intent of the Act.

Certain things are clear from the legislative history. The initial bill was offered by Senator Robertson. With an amendment by Senator Proxmire it passed the Senate and was offered in the House by Representative Ashley. It was not until after a majority of the House Banking and Currency Committee, in an allegedly "rump" session, had voted to approve the Ashley bill that Representative Patman agreed to let any bill come out of the committee. In reporting the bill which bears his name and which became the Bank Merger Act of 1966, Representative Patman reported to the Congress:

Mr. Chairman, if I alone were writing this legislation and proposing it, I certainly would not propose it as it is before us. I would be against it as a matter of principle. (Cong.Rec., Feb. 8, 1966, p. 2357.)

We think it reflects no discredit upon Representative Patman if the court, recognizing the limitations of human nature, views his interpretations of this statute with a jaundiced eye. He opposed the bill "in principle" and with all his legendary vigor. What would be more natural than for him to attempt to shave its impact as much as possible when it reached the floor of the House?

On the other hand, Senators Robertson and Proxmire had sponsored the legislation in the Senate, as had Representative Ashley [18] in the House. When the

17. H.R. No. 1179, 10/19/65. For a description of the bill's odyssey through Congress, see article from Wall Street Journal for February 8, 1966, entitled "The Bank Merger Bill's Zany Journey".

18. In submitting H.R. 12173, U.S.Code Congressional and Administrative News,

p. 1860 to the Senate, Senator Robertson acknowledged the large role played by Representative Ashley in securing passage: "I want to pay a special tribute to Congressman Ashley of Ohio for his work in connection with this bill. His untiring and constructive efforts

House passed the amended bill, Senator Robertson quickly sponsored the House version before the Senate Banking Committee, where it was approved by a 9 to 2 vote.

Since the bill was eminently satisfactory to its original sponsors and so distasteful to Representative Patman, is it not to the "winners" that we should turn for an evaluation of the meaning of the statute?

## COMPETING FINANCIAL INSTITUTIONS OTHER THAN BANKS.

The court, having concluded that the intent of Congress in deleting the phrase "line of commerce" from the Bank Merger Act of 1966 was to permit an assessment of the competitive effect of a merger, not in the narrow market consisting solely of commercial banks, but in the wider and more realistic field of all institutions which compete either for the savings or investment dollar or for the extension of credit, now reviews this wider field.

It would be appropriate to here also note that students have pointed out that because of the regulations to which banks are subjected, the character of their competition is quite different from that of other nonregulated industries or businesses and explains in part the reasons which prompted the 1966 amendments to the Bank Merger Act.[19]

have brought about the virtual unanimity in the House * * *." (Cong. Rec., Feb. 9, 1966, p. 2551.)
Congressman Grabowski, in the course of the debate, noted: "I am proud to have been associated with my colleagues [naming Moorehead, Ashley and Ottinger] * * * in helping to draft this legislation." (Cong.Rec., Feb. 8, 1966, p. 2355.)

19. For an expression of these views, see: The 1966 Amendment to the Bank Merger Act, Economic Perspective and Legal Analysis, 20 Vand.L.Rev. 200 (1966), and Phillips, Competition, Confusion and Commercial Banking, 19 J. Finance 32 (1964). The writer in the Vanderbilt Law Review article, at pages 201–203, noted in part:
While generally the occasional failure of business concerns is not considered undesirable in light of the overall benefits to be derived from unrestricted competition, the central role of banking in the national economy has fostered widespread recognition that bank solvency and liquidity are sufficiently important to require a check on competitive forces. Therefore, public regulation of commercial banking reflects an attempt to obtain the benefits of competition while guarding against widespread bank failure as a method of eliminating the less efficient competitors from the market structure. As a result the regulatory scheme is characterized by the somewhat conflicting objectives of efficiency through competition and stability through regulation.
The most fundamental regulation imposed upon the market structure of commercial banking is limitation of entry. A charter for a new national bank will not be granted unless the capital structure, earnings prospects and management capabilities of the prospective bank give adequate assurance that entry will not produce excessive competition and possible failure. Similarly, inability to meet these standards may cause the Federal Deposit Insurance Corporation (FDIC), in effect, to prevent entry by denying an application for deposit insurance. The FDIC, Federal Reserve Board (FRB), and the Comptroller of the Currency may refuse permission to open new branches on the same grounds. Furthermore, national banks are apparently subject to state law with regard to branching limitations.
Banks are also subject to numerous provisions designed to insure sound banking practices. For example, banks belonging to the Federal Reserve System (member banks) and insured nonmember banks are precluded from paying interest on demand deposits. This discourages competitive efforts to attract demand deposits and the correlative tendency to make speculative loans and investments to cover the interest costs. Federal law also requires the FRB and FDIC to specify maximum rates of interest that insured banks may pay on savings and time deposits. A number of states also limit the rate of interest payable, and, where the state rate is below the federal maximum, federal law requires that national banks not exceed the state maximum rate.
Regulation of competition also extends to the market for bank loans. The

The following uncontroverted data, contained in the record and appropriately cited by exhibit number, demonstrates the extent to which competition exists in the State of California between banks and various other financial institutions. The information is based upon a hypothetical statewide market and demonstrates the insignificance of Crocker-Citizens' share of the savings and credits throughout the state.

(a) In 1962, California savings amounted to $46,057,807,000, only 27.-12 per cent of which were held by commercial banks and only 2.63 per cent of which were held by Crocker and Citizens (BK-E-27):

| | (000 omitted) |
|---|---|
| Commercial Banks (IPC time deposits) | $12,493,031 |
| Savings and Loan Associations (Savings Capital) | 13,400,000 |
| U. S. Savings Bonds (Redemption value of bonds held by individuals) | 4,644,000 |
| Credit Unions (Share capital and member deposits) | 814,463 |
| Postal Savings (Balance to credit of depositors) | 32,137 |
| Life Insurance Reserves | 9,646,176 |
| Mutual Investment Funds (Market value of net assets) | 2,279,000 |
| U. S. Government Marketable Securities With Maturity Within 1 Year from Date of Issue | 2,749,000 |

area within which competitive forces operate is circumscribed as to maximum rates by state usury laws, and is affected as to the minimum charge by FRB manipulation of the rediscount rate, open-market operations and modification of reserve requirements. While the FRB operations are not regulatory in the strict sense, they affect the supply of money and credit in the economy and thereby influence the "prime" or minimum bank interest rate. In the range between the practical minimum set by Federal Reserve policy and the maximum allowed under state usury laws, competitive forces are free to operate. Moreover, national banks are precluded from lending more than an amount equal to ten per cent of their paid-in capital and unimpaired surplus to any one obligor, and state banks are generally subject to similar limitations. National and state member banks are also prohibited from investing in common stocks, and from holding for their own account investment securities of a single obligor in excess of ten per cent of the bank's unimpaired capital and surplus. Such investment prohibitions, while helping to insure continued stability, have the added effect of limiting the control which banks might otherwise exert over industry in general. In addition, the broad visitorial powers of federal bank examiners provide the agencies with a flow of information based on frequent and intensive examinations. The banks must furnish detailed periodic reports of their operations, and the agencies have the power to order examinations whenever they are deemed necessary. Numerous sanctions are provided, but the vast majority of banks go to great lengths to avoid grounds for criticism. The foregoing restrictions on private initiative have caused economists to question the extent to which antitrust policy can foster a type of competition conducive to improved bank performance. (Footnotes omitted.)

As of December 28, 1962, Crocker and Citizens combined held only 2.63 per cent of the total (BK-E-27).

(b) As of January 1962, commercial banks held only 10.01 per cent of California farm mortgage loans:

| | (000 omitted) |
|---|---|
| All Operating Banks | $ 138,604 |
| Life Insurance Companies | 208,760 |
| Federal Land Banks | 187,167 |
| Farmers Home Administration | 9,555 |
| Individuals and Others | 840,000 |
| Total | $ 1,384,086 |

As of the closest available date, Crocker and Citizens together held only 1.34 per cent of California farm mortgage loans (BK-E-28).

(c) As of January 1962, total California agricultural loans amounted to $2,184,790,000, only 33.4 per cent of which were held by operating banks:

| | (000 omitted) |
|---|---|
| All Operating Banks | $ 730,396 |
| Life Insurance Companies | 208,760 |
| Federal Land Banks | 187,167 |
| Banks for Cooperatives | 92,303 |
| Farmers Home Administration | 15,802 |
| Rural Electrification Administration | 35,020 |
| Production Credit Associations | 75,342 |
| Individuals and Others | 840,000 |

As of the closest available date, Crocker and Citizens combined held only 2.77 per cent of California agricultural loans (BK-E-29).

(d) As of 1962, California mortgage debt on non-farm real estate amounted to $32,150,162,000, only 18.6 per cent of which was held by commercial banks:

| | (000 omitted) |
|---|---|
| Commercial Banks | $ 5,978,775 |
| Mutual Savings Banks | 2,196,000 |
| Savings and Loan Associations | 13,941,000 |
| Life Insurance Companies | 5,634,387 |
| Others | 4,400,000 |

As of the same date, Crocker and Citizens held only 1.80 per cent of that total (BK-E-31).[20]

20. The accuracy of the above tabulation is reflected in table 14 of the Report of the Governor's Banking Study Committee on the Future of Banking in California (January 26, 1965), which is based on data for 1951 as of March 31; for 1954 and 1960 as of September 30; and 1957 and 1962 as of October 31. The table clearly demonstrates the extent to

(e) In 1962, commercial banks held only 32.74 per cent of the total California business loans and credit outstanding. The $21,276,-061,000 total amount of such loans and credit was held as follows:

| | (000 omitted) |
|---|---|
| Commercial Banks | $ 6,945,861 |
| Commercial and Finance Company Paper | 598,800 |
| Small Business Administration | 76,600 |
| Finance Companies | 1,111,700 |
| Life Insurance Companies | 2,064,400 |
| Savings and Loan Associations | 588,700 |
| Trade Credit | 9,830,000 |

Crocker and Citizens held 2.85 per cent of that total (BK-E-33).

(f) In 1962, commercial banks held only 44.36 per cent of California's $7,101,896,000 installment and non-installment consumer credit:

| | (000 omitted) |
|---|---|
| Commercial Banks (Installment credit and single payment loans) | $ 3,150,596 |
| Other Financial Institutions (Single payment loans) | 87,500 |
| Sales Finance Companies | 1,219,400 |
| Credit Unions | 497,300 |
| Consumer Finance Companies | 379,900 |
| Others—Installment Credit | 160,000 |
| Retail Outlets (Installment credit and charge accounts) | 1,156,600 |
| Credit Cards | 51,200 |
| Service Credit | 399,400 |

Crocker and Citizens had 5.56 per cent of that total (BK-E-35).

which competition from other financial institutions has materially affected a very substantial element within the banks' line of commerce between 1951 and 1962:

TABLE 14

AN ESTIMATE OF MORTGAGE DEBT HELD BY THE FOUR
MAJOR INSTITUTIONAL LENDERS ON CALIFORNIA
REAL ESTATE, SELECTED YEARS

Mortgage Debt Held By

| Year End | Commercial banks | | Savings and loan ass'ns | | Insurance companies | | Mutual savings banks | |
|---|---|---|---|---|---|---|---|---|
| | Amount (Millions) | Percentage of total | Amount (Millions) | Percentage of total | Amount (Millions) | Percentage of total | Amount (Millions) | Percentage of total |
| 1951 | $2,896 | 43.4 | $1,412 | 21.2 | $2,335 | 34.9 | $ 32 | 0.5 |
| 1954 | 3,574 | 35.1 | 2,835 | 27.8 | 3,386 | 33.3 | 382 | 3.8 |
| 1957 | 4,410 | 29.2 | 5,068 | 33.6 | 4,540 | 30.1 | 1,064 | 7.1 |
| 1960 | 5,181 | 24.2 | 9,141 | 42.7 | 5,458 | 25.5 | 1,621 | 7.6 |
| 1962 | 6,153 | 21.6 | 13,941 | 49.0 | 6,169 | 21.7 | 2,196 | 7.7 |

The financial institutions which compete with commercial banks are located in every part of the State of California:

(a) The Morris Plan Company has 47 offices in 46 communities located in every area of the state. Its eight San Francisco Bay area offices include at least one in each of the five counties which plaintiff claims to be the relevant local market, and its 12 offices in the Los Angeles metropolitan area include three in Orange County and nine in Los Angeles County. As of December 31, 1955, it had total assets of $115,067,049 and total loans of $116,913,051 (BK-GGG, pp. 1–2).

(b) As of December 31, 1964, there were 70 federal and 206 state chartered savings and loan associations doing business in California through 670 offices located throughout the state (BK-GGG, p. 3; Ct. 195 (Exh. 15–B, p. 2)). Their total assets amount to $23.9 billion. Of those, 43, with total loans of $3 billion and total share accounts of $2.9 billion, have their headquarters in the San Francisco Bay area. Another 112, with total loans exceeding $13 billion and total assets exceeding $12 billion, are headquartered in Los Angeles and Orange Counties (BK-GGG, p. 3).

(c) As of December 31, 1965, there were nine agencies of the General Motors Acceptance Corporation in California having 18 offices in the principal economic areas of the state. Their total loans and discounts exceeded $450 million and their total assets amounted to more than $460 million. The two agencies located in the San Francisco Bay area had total loans and discounts of almost $100 million and total assets exceeding that sum. In Los Angeles and Orange Counties, five General Motors Acceptance Corporation agencies with seven offices have total loans and discounts of more than $300 million and total assets of more than $306 million (BK-GGG, p. 4).

(d) The California Department of Veterans Affairs, Division of Farm and Home Purchases, has 14 offices located in the principal economic areas of the state, and as of June 1965, had 127,201 home loan purchase contracts outstanding, with a total outstanding balance of $1.3 billion, and in addition, had 1,294 farm loan purchase contracts outstanding, with a total balance of $31.5 million. Of those, almost 25,000 home loan purchase contracts, with an outstanding balance of approximately $260 million, were held by its two offices in the San Francisco Bay area. The three offices in Los Angeles and Orange Counties held almost 40,000 home loan purchase contracts, with an aggregate balance of more than $380 million (BK-GGG, p. 5).

(e) Finance companies are also very active in the California local markets. As of 1961, there were 1,183 finance company offices in California, with total loans of $695 million (Ct. 195 (Exh. 15–C, p. 6)).

(f) Credit unions are active throughout California. As of 1962, they numbered approximately 1,750, had total assets of $917 million, total loans of $765 million and total share accounts of $814 million (Ct. 195 (Exh. 15–C, p. 2)). As of 1965, there were 88 operating credit unions in the San Francisco Bay area, including 28 in the City and County of San Francisco, 8 in San Mateo County, 14 in Contra Costs County, 2 in Marin County and 36 in Alameda County (BK-GGG, pp. 6–8). On the same date, there were 136 operating credit unions in Los Angeles County and another 17 in Orange County, for a total of 153 in the Los Angeles metropolitan area (BK-GGG, pp. 9–12).

(g) Some 371 insurance companies do business in the State of California. Together they have total assets of $156.7 billion and total loans of $65.8 billion (BK-GGG, pp. 21–36). The assets of 27 of them each exceed $1 billion, 16 exceed $2 billion, 11 exceed $3 billion, 8 exceed $5 billion and 2 exceed $20 billion (BK-GGG, pp. 21–36).

(h) There is no shortage of insurance companies doing business in the local markets in California. Some 200 insurance companies are represented in the five-county San Francisco Bay area. Together they have assets in excess of

$149 billion and loans exceed $63 billion (BK–GGG, pp. 13–16). A slightly larger number do business in Los Angeles and Orange Counties. There some 213 insurance companies are represented, with total assets exceeding $150 billion and total loans exceeding $63.8 billion (BK–GGG, pp. 17–20).

In plaintiff's hypothetical state market, where convenience is no longer a controlling factor, not only must a drastic modification (a reduction in percentage figures, as will be hereinafter shown) be made to reflect the foregoing data showing the competition given commercial banks by all financial institutions, but a further adjustment must be made to account for both out-of-state and foreign banks. Before making such necessary adjustments to plaintiff's concentration ratios, we reiterate and reemphasize that were the court to confine its consideration of the facts of this case to commercial banking as the sole line of commerce, and thus accept the plaintiff's interpretation of subparagraph B of § 1828(c)(5) of Title 12 U.S.C., we would still make the same basic findings herein made and reach the same conclusion.

## ADJUSTMENTS TO PLAINTIFF'S CONCENTRATION RATIOS.

Throughout the trial, in its proposed findings and its brief, plaintiff has placed reliance on its concentration figures, so-called "concentration ratio",[21] as an assertedly reliable indicator of the probable competitive effects of the instant merger. One would think, therefore, that plaintiff would endeavor to present the court with a figure closely approximating the actual state of affairs, particularly since plaintiff has the burden of proof on that issue. Yet, plaintiff made no adjustment in any of its exhibits purporting to reflect concentration ratios for the business done in California by out-of-state banks, notwithstanding (1) its knowledge that the Supreme Court made a 16⅔ per cent adjustment therefor (from 36 per cent to 30 per cent) in United States v. Philadelphia Nat. Bank, supra, 374 U.S. at 364 n. 40, 83 S.Ct. 1715; (2) its concession that California is a capital import state and that out-

---

21. The recent case of United States v. Von's Grocery Co., 384 U.S. 270, 86 S. Ct. 1478, 16 L.Ed.2d 555 (1966), definitely established that concentration is a function of the market. That case involved the merger of two competing grocery chains in the Los Angeles area. Mr. Justice Black's majority opinion makes clear that section 7 deals with the number of separate *competitors* and *market* concentration. In disregarding a finding of the district court that there had been no increase in concentration, Mr. Justice Black noted that there had been a decline of more than 1700 separate competitors in the market and, speaking for the majority, stated:

> It is thus apparent that the District Court, in finding No. 80, used the term "concentration" in some sense other that a total decrease in the number of separate competitors which is the crucial point here. (384 U.S. at 273 n. 3, 86 S.Ct. at 1480.)

He goes on to state:

> Thus, where concentration is gaining momentum *in a market*, we must be alert to carry out Congress' intent to protect competition against ever increasing concentration through mer-

gers. (384 U.S. at 277, 86 S.Ct. at 482.) (Italics added.)

In the instant case there has been at least a 35% increase in the number of separate competitors in every local banking market which plaintiff contends are relevant for judging the effects of the instant merger (BK–M; BK–N; BK–P; BK–Q; BK–OO; BK–PP). During the period 1954–1964, 706 new entries added as many "separate competitors" in various communities throughout California (BK–H; BK–I; BK–J). In the short period since the Crocker-Citizens merger, 69 new banks have been established in various sections of California, 19 of them in Los Angeles County (G–360). Interestingly enough, even if the state as a whole is taken as a market, we find that in terms of independent competitors, there has been a substantial increase in the number of competing banks since 1945 because, as Professor Dirlam had to admit, the Government overlooked the fact that its 208 "banks" in 1945 included all the Transamerica banks, as well as other affiliated banks which were not independent competitors (Dirlam, Tr. 729–733).

of-state banks solicit the loans of business firms in California; and (3) prior warning that the amount of such business would be in issue.

■ Even if there were no evidence on the extent of the adjustment required, some adjustment would have to be made. In the *Philadelphia* case, the Supreme Court reduced the share of the merging banks from 36 per cent to 30 per cent for business done by banks outside the relevant area, though there was no evidence reflecting the amount of that business. Since California is growing more rapidly than Pennsylvania, and since larger amounts of capital are imported to finance that growth, it would be expected that a larger percentage of bank financing would come from out of state. In an effort to make this necessary adjustment, Professor Weston not only relied upon the study of capital imports for home loans made in California by Leo Grebler, Professor of Real Estate and Urban Land Economics of the Graduate School of Business Administration at U.C.L.A., wherein he estimated that out-of-state funds provided 38 per cent of California home mortgage loan funds (and further concluded therefrom and his own knowledge and experience that a higher percentage would be expected for business loans) (Tr. 1580), but he also made an independent study based upon a 1955 loan survey of the Governors of the Federal Reserve System (BK–Y, Tr. 1555). On the basis of that survey, which was the only source of data from which out-of-state bank loans to California borrowers might be derived, he calculated that of the total business loans made to California borrowers by commercial banks in the United States, the combined share of Crocker First National Bank and Anglo-California National Bank (which became Crocker-Anglo National Bank in 1956) and Citizens National Bank was only 6.41 per cent, which when compared with their 9 per cent share of the reported business loans by all California banks, represents an adjustment (reduction) of 28.78 per cent (BK–Y, Table 4; Tr. 1560–1568). The effect of such an adjustment, which it would be erroneous not to make, will be hereinafter shown.

The *magnitude of the adjustment* required to compensate for business done by out-of-state banks is itself evidence of the fact that the whole of California *is not a relevant commercial banking market* (Weston, Tr. 1583), a market based on economic facts that correspond to business reality.

An adjustment of Crocker-Citizens' share of the hypothetical statewide market should also be made for available resources of foreign banks. Such an adjustment is difficult, if not impossible, to measure, unless we resort to plaintiff's theory that every office of a bank has behind it all the resources of its whole system. In such event, if we were to postulate as the Government does, an adjustment of plaintiff's concentration figures for California would have to include resources from foreign banks. The resources of these foreign banks, with subsidiaries and agencies in California, totaled $23.23 billion as of December 31, 1962, as contrasted to $29.99 billion for all California banks. As of that date, the resources of such foreign banks were of such magnitude as to reduce Crocker-Citizens' hypothetical market share of deposits suggested by the Government from 9.6 per cent to 5.4 per cent (BK–Z, Table II). This we know would be an erroneous reduction, since a foreign bank, even more so than a statewide bank, cannot afford to risk all of its resources in a single market, nor are foreign banks generally able to do so because of capital export restrictions imposed by law in most countries. However, it is clear from the evidence in this case, including the testimony of plaintiff's witnesses Thomson and Goto, representatives of the Chartered Bank of London and the Bank of Tokyo, Ltd., that a part of these total resources are available as a potential factor in California competition. What part of these resources are so available and the degree to which they would require a reduction of Crock-

**164**

er-Citizens' market share in California we cannot say nor reliably estimate. What we do know is that these foreign banks already have offices, and in one case, nine locations, in California.[22] Even though only a portion of the very substantial world-wide resources of these foreign banks are available for use in California, the availability of such resources would enable these offices to participate substantially with little effort in the asserted statewide market and in the local markets where they have offices (Goodman, Tr. 1735, 1880–1881). In the same way that a branch can shift its lending power from one particular branch to another, a foreign bank with an agency in California can shift its relative lending power from Montreal or London to San Francisco or Los Angeles (Goodman, Tr. 1737). The amount of funds that an agency of a foreign bank will divert to California is, from an economist's standpoint, determined by the profits to be made. If there were a substantial increase in interest rates in California, there would be an immediate influx of funds brought into California for lending by foreign banks (Goodman, Tr. 1722–1723). Even plaintiff's staff economist testified that Crocker's ability to concentrate their total resources in the Los Angeles metropolitan area differed from the foreign banks' ability to concentrate their resources in California only in degree (Gaffey, Tr. 1100).

It is apparent from the foregoing that the resources of foreign banks operating in California would require some further adjustment in Crocker-Citizens' assumed market share, and while it could never equal a reduction from 9.6 per

cent to 5.4 per cent, as the logic of plaintiff's theory of availability of total resources of a bank with branches would lead us, it would, nevertheless, be substantial. However, since we are unable to measure this reduction in percentages, we make no further reference thereto, except to note that the percentage ratio of Crocker-Citizens' share of the assumed market should in fact be slightly less than the figures hereinafter established by the court.

## PLAINTIFF'S CONCENTRATION FIGURES ARE UNRELIABLE.

Primarily, for the reasons above indicated, we not only find that plaintiff's *limited* line of commerce figures purporting to show increases in concentration are unrealistic and inappropriate for the purpose of assessing the competitive effect of the instant merger, but we are further satisfied that these figures, *which are related almost wholly to the Bank of America,* are inconsistent with plaintiff's theories of market, unreliable and unsound. Furthermore, they are not supported by the banking agencies.

The trial revealed a basic inconsistency in plaintiff's theory which undermined the testimony of both its experts and its exhibits. Dirlam and Gaffey assumed that the State of California was a market and that the number of competing banks had declined very substantially between 1945 and 1963. This being their theory, they had to admit that affiliated banks or banks commonly owned did not compete against each other. When this fact was brought to their attention, together with the existence of Transamerica as a holding company,[23] they had to

22. On December 31, 1964, there were six state chartered foreign banks having 22 banking offices and agencies of seven foreign banks doing business in California. Two others had permits and stated they would open in 1965.

23. In determining how many banks were controlled by Transamerica, plaintiff's expert voiced the opinion that a 20% interest would be significant (Tr. 730). In 1949, Transamerica owned at least

20% of the outstanding stock in some 27 California banks, including Bank of America and Citizens.
In reaching his opinion as to the alleged reduction in the number of banks in California, Dirlam was of the belief that the total number of banks in the state dropped from 171 in 1954 to 129 in 1962, for an overall reduction of 42 (Dirlam, Tr. 735, lines 9–12; G–25). In reaching that conclusion, Dirlam overlooked

admit that instead of there being a decline in the number of banks between 1945 and 1963, there was a substantial increase in the number of competing units in California during that period. Witness the testimony of Dirlam [24] (Tr. 729, lines 20–24):

Q. How many of those 208 banks in 1945 were controlled by Transamerica Corporation?

A. That I don't know.

Q. Didn't it ever occur to you to ask that?

A. As a matter of fact, it didn't.

and (Tr. 733, lines 9–17):

Q. * * * Can't we agree on one other thing, Doctor, that neither you nor I know the precise number, but from the standpoint of independent competing units, the number of independent competing units is greater in 1964 than it was in 1945? How much is the only question.

A. To the extent that Transamerica has * * *

Q. That's right.

A. I think I would agree on that.

Q. When you originally testified on direct, you thought the reverse was true, did you not?

A. Yes.

Strangely enough, plaintiff, in its opening brief, still contended that " * * * the total number of competing banks actually went down from 208 in 1945." Inasmuch as the evidence shows that there were other affiliated banks in 1945 and later and that plaintiff made no at-

---

the fact that a number of the banks in existence prior to 1962 were controlled by Firstamerica (Dirlam, Tr. 735, line 9–Tr. 736, line 5). Under this hypothesis, however, the banks controlled by it could not be regarded as independent competing units. They were not competing against each other (Dirlam, Tr. 736, lines 6–9).

It was during the period 1954–1962 that the "old" First Western purchased 23 banks from Transamerica (G–30, nn. 2, 3). It was also during that period that The California Bank and the "old" First Western acquired 33 other banks (for a total of 56) to form the present United California Bank in February 1961, with the approval of the Department of Justice (G–26, pp. 6–7).

How many other banks in existence in 1945 and which merged prior to the end of 1964 were similarly controlled by common shareholders cannot be ascertained from the evidence. Plaintiff's witness had no way of knowing (Dirlam, Tr. 731, 732).

One group of banks under common ownership which plaintiff treated as four separate banks were the Work banks in Salinas, Monterey, Carmel and Pacific Grove. All four had been controlled by the Work family prior to Crocker-Anglo's acquisition of the Salinas bank in 1956 and of the other three in 1959 (G–26, p. 2; G–337, p. 51, lines 22–24; p. 52, lines 13–18; p. 54, lines 4–6).

Plaintiff even counted the Bank of San Rafael and First National Bank in San Rafael as separate banks, although they had identical shareholders, identical of-

ficers, shared the same building and published statements in the same annual report (G–26, p. 2; G–337, p. 94, line 20–p. 95, line 6). Moreover the Bank of San Rafael was a savings bank without demand deposits, and by Dirlam's definition "savings banks" were outside the line of commerce (G–13; Dirlam, Tr. 493, 556, 558).

24. The testimony of Professor Joel B. Dirlam as it related to banking in California was too speculative and hypothetical to carry much weight with this court. He had only recently been concerned with the field of banking, had never been to Los Angeles, had never been to San Francisco prior to the trial, knew nothing about the various other California communities other than what was disclosed on maps, had made "no particular study of California", and did not investigate banking in California. Contrasted to his testimony is that of Professor J. Fred Weston of the Graduate School of Business Administration of the University of California, Los Angeles, who knows California well and had had many years' experience in the problems of the financial industry in California, and Associate Professor Oscar Goodman of the Graduate School of Business at Northwestern University, who was one of the experts relied upon by the Government in the *Philadelphia* and *Lexington* cases, who had resided and taught for a period in California and who had made a special, extensive and "on the ground" study of the banking situation in California for the purposes of the trial of this case.

tempt to eliminate any affiliates or subsidiaries other than those of Transamerica (Pltf. Opening Brief, p. 34, n. 1), it is apparent that plaintiff's figures are unreliable. Even on plaintiff's figures, however, the number of banks increased from 178 in 1950 to 200 in 1964 (G–25A). Dr. Gaffey, plaintiff's staff economist, testified that this trend was a favorable factor (Tr. 1145–1146).

■ Statistically, plaintiff's analysis of the effect of the instant merger on concentration was fallacious, as well as hypothetical. All plaintiff's figures on concentration included Crocker-Citizens with the Bank of America. On almost every basis the Bank of America has approximately a 40 per cent share of the hypothetical state market. It has more offices in Los Angeles County alone than Crocker-Citizens has in the entire state. For this reason, as Professor Goodman points out, it is statistically unsound to group the Bank of America together with any other bank in an attempt to analyze what effect the other bank has on markets or market structure.[25]

**25.** On this point Professor Goodman testified as follows:

Q. Now would you tell us what is involved statistically in economics whenever you take, for example, one unit, such as Crocker-Citizens, and put it with a group such as "all others" or put it with a group such as "the first five," what is a statistican [sic] or economist trying to do when he does that?

A. One has many purposes in examining data. One ordinarily groups data in order to draw off some significant conclusions relative to particular size or particular groups. When he groups data, he must group data which will lend itself to such analysis.

If one group, as we have in No. 1, the Bank of America with "all others" in this case, the two statistics taken as a group demonstrate that the Bank of America—as a result of its presence in many, many more local markets in the state of California than any other bank in the state of California, the accumulation of the sum total of the participation of the Bank of America in all of the local markets in California is so dominant a figure that if you were to add any other figures to the Bank of America, the result: No other individual banks could affect the end result that you would get, all the figures would be dominated by the Bank of America.

It is like trying to combine a giant and a pigmy and say something about the size of a man by so doing. They are two separate classes of men and you cannot draw off a conclusion as to the average of a man by combining a 20 foot giant with a 4 foot pigmy.

Statistically this is impossible, to get relevant or meaningful figures from such a combination.

Q. And is this what occurs in the category No. 3, which shows the cumulative total for the first five banks?

A. Yes. The figure is dominated completely by the Bank of America. No changes among the other four could very much affect the end result because when you add a giant, which is in a class all by itself, with the others, which fundamentally are in a completely different class, the sum total does not reflect like items. It reflects two separate groupings of items.

Q. Sort of like saying Cashus [sic] Clay and Archer and Schoepke could lick any man in the courtroom. It is a true statement but it doesn't show much about Archer's or Schoepke's physical prowess.

A. I think that's a fair statement.
(Tr. 1766–1768)

JUDGE POPE: On that last exhibit I would like to ask this witness a question (Exhibit BKYY).

Does your theory as to the effect of adding a very small peripheral concern to the market in which there is one dominant operator square with the theory that was developed by the Supreme Court of the United States in the Aluminum Company case in which the Court said something like this—this is quoted from the Philadelphia Bank case, with which I think you are familiar—

THE WITNESS: Yes, sir.

JUDGE POPE:

"It is no answer that, among the three presently largest firms * * * there will be no increase in concentration. If this argument were valid, then once a market has become unduly concentrated, further concentration would be legally privileged. On the contrary, if concentration is already great, the importance of preventing

Professor Goodman testified that such a grouping of the Bank of America with other banks produces what is known in statistics as an inverted "J", from which it is impossible to obtain a statistically meaningful analysis. Plaintiff's expert had to admit that if in the hypothetical California market, the Bank of America were omitted, there would be no economic basis for objecting to concentration in that market. On the other hand, if Crocker and Citizens were both excluded from plaintiff's statistical analysis of that hypothetical market, concentration would still exist. Accordingly, any concentration in the California hypothetical market is not a function of Crocker-Anglo or Citizens alone or together. And, further, there was no evidence that the merger of Crocker and Citizens created a bank, which, by itself or in combination with any other bank other than the Bank of America, could adversely affect competition in California banking. From an economist's standpoint a market in which about 155 (or more accurately, some 200) banks have 60 per cent of the market is a healthy market.

The Government attempts to make something out of the fact that the two voting FDIC directors "deadlocked" in reporting on the merger. We rather think that the FDIC directors stood two to one in the banks' favor because the Comptroller clearly favored the merger, and though an FDIC director, abstained from voting (BK–A, p. 54).

In 1961, the Board of Governors of the Federal Reserve System launched a new program for comprehensive research in the field of banking structure and bank competition. This research included an over-all study of the measurement of concentration which is reported in Smith, "Measures of Banking Structure and Competition," 51 Fed. Reserve Bull. 1212–1222 (Sept. 1965). The general conclusions there reached substantiate the specific conclusions we have reached regarding markets in this case. Smith points out the weaknesses of concentration ratios which fail to consider disparity in size of banks (ibid. at 1214, 1215) and which fail to consider all competitors within the market (ibid. at 1215). He affirms the necessity for a reliable definition of market area (ibid. at 1216–

even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great."
And further down:
"The acquisition of Rome added, it is said, only 1.3 percent to Alcoa's control of the aluminum conductor market. But in this setting that seems to us reasonably likely to produce a substantial lessening of competition of Section 7."
How does the theory that you expounded in respect to this last exhibit square with that?
THE WITNESS: All I have been talking about so far, Your Honor, is the question of a measurement of size.
The question that you have asked me to address myself to is the significance of changes in competitors in a particular market, the effect on competition in that market of a change of competitors.
You must, in order to do that, set up some measurement of size, study the tone of competition and come to some conclusion about the effect of competition.

The example that you posed poses a situation where the number—the giant in your case, the Aluminum Company—in this case the Bank of America—were to combine with a pigmy, and the result would be an increase in the size of a giant as a result of merger on the tone of competition in that market and on the potential competition in that market.
We do not have that situation in this case. This is a completely different situation. We have a situation where we have a giant and then many much smaller other competitors, and eventually, after—I will be glad to address myself to the question, of the effect on competition in this proposed market of a change in the relative size of two of the competitors in this market which has 200 competitors, on the tone of competition in that market at the present time and on the potentiality of competition. In other words, that is the question we address ourselves to. The example in the Aluminum case does not apply to this particular set of statistics.

(Tr. 1769–1771)

1217). He also finds banking markets to be local or national (ibid. at 1217–1218). He states (ibid. at 1216–1217): "The metropolitan area may indeed be the appropriate market area. If so, the State, or the nation, could not also constitute the appropriate market area." Accordingly, all plaintiff's suggested findings on concentration are without basis in fact and unsound in theory.

The largest increase in concentration in plaintiff's hypothetical statewide market in the period 1950 to 1962 was caused by the creation of United California Bank. The increase was over three times the increase in concentration caused by the merger of Crocker and Citizens. Yet none of the agencies, including the Department of Justice, viewed the creation of United California Bank as creating an increase in concentration. (1961 Ann. Report FDIC, pp. 60–62; 48th Ann. Report of Board of Governors of Fed. Reserve System, 150–52.) On the other hand, the instant merger produced only a very slight change in the market structure, even in plaintiff's hypothetical statewide market. First Western Bank was also created with Government approval.

■ A consistent statistical analysis of the plaintiff's hypothetical market shows that the merger was insignificant. If the statistical methods showing changes in market structure which were employed by the Department of Justice in the Philadelphia case, but which it elected not to employ in the instant case, were used as demonstrated by Exhibit BK–VV,[26] the change is almost impercep-

26. RELATIVE RANKING OF CALIFORNIA BANKS ON THEORY OF GOVERNMENT'S EXHIBIT 32 IN UNITED STATES v. PHILADELPHIA

I

Government's Exhibit 32

Table 32

Relative Ranking of the Five Largest Philadelphia Banks by Total Deposits

(No. 1 Bank—100)

| Before Consolidation | | After Consolidation | |
|---|---|---|---|
| Bank No. 1 (1st Penna) | 100 | Bank No. 1 (Phila-Girard) | 100 |
| Bank No. 2 (Phila Nat'l) | 97 | Bank No. 2 (1st Penna) | 62 |
| Bank No. 3 (Girard) | 65 | Bank No. 3 (Provident Trades) | 28 |
| Bank No. 4 (Provident Tradesmen's) | 45 | Bank No. 4 (Fidelity-Phila) | 26 |
| Bank No. 5 (Fidelity-Phila) | 42 | Bank No. 5 (Central-Penn) | 15 |

SOURCE: Record on Appeal, 2413

II

Relative Ranking of the Ten Largest California Banks by Deposits

| | Before Merger | | After Merger | |
|---|---|---|---|---|
| First Bank | B of A | 100 | B of A | 100 |
| Second Bank | Security First | 34 | Security First | 34 |
| Third Bank | Wells Fargo | 25 | Wells Fargo | 25 |
| Fourth Bank | UCB | 20 | CROCKER-CITIZENS | 25 |
| Fifth Bank | CROCKER-ANGLO | 18 | UCB | 20 |
| Sixth Bank | Union | 8 | Union | 8 |
| Seventh Bank | Bank of California | 7 | Bank of California | 7 |
| Eighth Bank | CITIZENS NATIONAL | 6 | First Western | 5 |
| Ninth Bank | First Western | 5 | 1st Nat'l, San Diego | 2 |
| Tenth Bank | 1st Nat'l, San Diego | 2 | Hibernia | 2 |

SOURCE: Deposits December 28, 1962. G–29

tible. The market share of the nine largest banks in the hypothetical market at the end of 1962 was substantially the same as the market share of the nine largest banks at the end of 1963 after this merger. Accordingly, if there was any significant effect on concentration, it was among those banks which have statewide facilities and in this area the effect of the merger was obviously to decrease concentration.

## APPROPRIATE SECTIONS OF THE COUNTRY.

 In its complaint and in the pre-trial proceedings, plaintiff eliminated from the consideration of this court any question of the effect of the instant merger in national and international markets (Pre-Trial Order, pp. 3–4, 9, 11). At all events, the evidence will in no way support any conclusion that the instant merger had any actual or potential adverse competitive effect in either of the markets. If anything, the evidence, as will be herein shown in the court's discussion of convenience and needs of the community, affirmatively shows that California benefited by reason of the ability of Crocker-Citizens to compete a little more effectively in these markets.

 The geographic market was originally limited to the State of California as a whole, the Los Angeles metropolitan area (Los Angeles and Orange Counties), and the San Francisco Bay area (City and County of San Francisco, and counties of Alameda, Contra Costa, Marin and San Mateo), BK–AA, No. 55). At the final pre-trial conference, plaintiff added three counties as alleged separate sections of the country: Ventura, Santa Barbara, and Kern Counties. At that time the court stated that, if, at the close of plaintiff's case, plaintiff was relying on these three counties as markets

for evaluating the instant merger, the defendant banks would be granted additional time within which to prepare; however, this proved unnecessary, for neither of plaintiff's experts testified that Ventura, Santa Barbara or Kern Counties were appropriate sections of the country for assessing the impact of the merger. The court regards plaintiff as having abandoned any contention that those counties are appropriate sections of the country within which to judge the instant merger.[27] In fact, there is no evidence on which it could be found that any one of these three counties was itself a market or a sub-market.

## CALIFORNIA AS A WHOLE.

To find adverse effects of the instant merger, plaintiff asserts that the state as a whole is a section of the country. It must do this because otherwise no competition between Crocker and Citizens can be found, and if there is no competition, there can be no increase in concentration. Likewise, prior mergers in the state as a whole could not be assumed to have adversely affected competition without evidence of such effects. It is obvious, for example, and plaintiff's experts admitted, that there was no change in the banking structure in the Los Angeles metropolitan area, in the San Francisco Bay area, or in other local markets as a result of the merger (Dirlam, Tr. 638; 676).

 The following pragmatic data demonstrates that the State of California is not a market or section of the country:

(1) The geographic extent of the State of California, hereinbefore described, precludes it from being a market for commercial banking services which are essentially local in nature;

(2) Notwithstanding the fact that, before the complaint in the instant case was

---

27. And if these counties could be said to be appropriate sections of the country in which to assess the impact of the merger, on the record before us, we would clearly find that any claimed lessening of competition, actual or potential, in these counties "would be *de minimis*", just as we did for Ventura County when we denied the plaintiff's motion for a preliminary injunction. United States v. Crocker-Anglo Nat. Bank, D. C., 223 F.Supp. 849, 854. The record on this score is no better today than it was then.

filed, plaintiff had been supplied with the names and addresses of all customers for whose business the two banks allegedly competed and the fact that it had available to it numerous files on mergers of other banks in the State of California, plaintiff could not produce the name and address of any customer in a statewide banking market, even when ordered by the court to do so (BK–CC, Order on Bank Defendants' Motion to Compel Further Answers, Tr. 462) ;[28]

(3) The hypothesis of a statewide market assumes that banks located in different sections of the state are competing against each other (Goodman, Tr. 1870). In its exhibits purporting to show concentration ratios applicable to the statewide market, plaintiff included every bank in the state, yet:

(a) Plaintiff's expert witness had to admit that not all banks in the state were competing in metropolitan Los Angeles and that not all banks in the state were competing in the San Francisco Bay area (Tr. 732–722) ;

(b) In showing the structure of the San Francisco Bay area market, plaintiff's expert excluded the second largest bank in the state, Security First National Bank, which is substantially twice the size of Crocker;

(c) In showing the structure of the Los Angeles metropolitan area banking market, plaintiff's experts excluded the third largest bank in the state, Wells Fargo Bank, which is substantially four times the size of Citizens;

(d) Plaintiff's expert, Gaffey, had no evidence that the Union Bank in Los Angeles was competing against the Hibernia Bank in San Francisco, and he knew of no banks that were competing with the Bank of America in San Diego who did not have offices there (Tr. 1069) ;

(e) Plaintiff admitted that Crocker did not compete with banks in the Los Angeles metropolitan area (BK–AA, No. 15) ;

(f) Plaintiff admitted that Citizens did not compete with banks in the San Francisco Bay Area (BK–AA, No. 15) ;[29]

(4) A market survey of the customers of banks made by Professor Weston,

---

28. At the trial the court ruled as follows on the admissibility of customer lists (Tr. 462):

> Now, with respect to the failure of the Government to give the names of customers known to them as requested, at that stage we do not observe any prejudice to the defense. I don't know how you could ask for a better admission than, in effect, the admission by the Government, "We don't know of any such customers." In other words, it approaches a statement that, "We don't have any proof that there was such competition." At any rate, our ruling has been indicated and we will proceed from there.

That observation still applies and clearly points up plaintiff's failure to prove that there are customers in the statewide market and customers for whose business Crocker and Citizens competed.

29. After admitting that Crocker and Citizens competed in different geographic areas, Professor Nicols suggested that some significance might be attached to the fact that both banks competed with branches of the Bank of America (Tr. 2276). Citizens, however, was in direct

competition with 50 to 80 other banks in the Los Angeles area, including some of the largest banks in the state and in the world (BK–Q; BK–Z; BK–PP). Under those circumstances, a bank not actually operating in the area would have no effect upon local market conditions. One could as well argue that because Crocker-Citizens competes with The Bank of California, and because The Bank of California competes with banks in Seattle and Portland, Crocker-Citizens competes with banks in Portland and Seattle. A similar argument could be made with respect to the foreign banks having offices in California. It appears to us this argument was, in effect, made by other defendants and rejected in Crown Zellerbach v. FTC, 296 F.2d 800 (9th Cir. 1961), cert. denied, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962), and in United States v. Philadelphia Nat. Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

Accordingly, this is not a case like United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), where the Government proved a state market by showing actual competition between the two beer companies through-

whom this court finds eminently qualified to make such survey and which this court deems to have been a fair, representative, and adequate economic survey, demonstrates that there were no customers in such hypothetical statewide market (and the Government never offered any proof to the contrary) (BK-G; Weston, Tr. 1682-1686);

(5) The survey of the customers of Crocker First National Bank and Anglo California National Bank in December 1955 showed a very small number outside the five Bay Area counties and none in a statewide banking market;

(6) If the State of California were itself a market, the creation of United California Bank would have caused the largest increase in concentration in that hypothetical market in recent years. Plaintiff's expert admitted that there are no factors suggesting the existence of a statewide banking market at the present time which did not exist in 1962 when the United California Bank was created (Dirlam, Tr. 742). It is therefore inconceivable that a banking market of the magnitude of that now asserted by plaintiff could have existed and gone undetected by the FDIC, the Federal Reserve Board and the Department of Justice, all three of which passed upon the creation of the United California Bank. Yet not one of those agencies stated in its report that there was a statewide banking market in California (other than for banks with statewide facilities) which would be adversely affected by the creation of that bank, nor did any of them state that concentration was increased or that earlier mergers had adversely affected any such market. (48th Ann. Report, Board of Governors, pp. 150-152; 1961 Ann. Report FDIC, pp. 60-62). It is also inconceivable that plaintiff would have failed to call the court's attention to that increase in concentration at the time the settlement of the *Firstamerica* case was submitted to the court for approval if there had been such a market. It did not do so. United States v. Firstamerica Corp., Civil No. 38139, N.D.Cal., and letter on file therein dated September 27, 1960, from the Department of Justice.[30] The market, therefore, did not exist then, and it does not exist now.

From the standpoint of opinion evidence, as we pointed out in footnote 24, supra, plaintiff relied on an expert who had absolutely no familiarity with the State of California and who could not claim to be a financial expert.

On the other hand, defendant banks' expert, Goodman, although he was far more familiar with California and California banking than plaintiff's expert, Dirlam, declined to render an opinion or otherwise aid the defense before making an exhaustive study of California and banking in California, which included making on-the-site visits to banking offices, inspecting bank loan files, interviewing loan officers, and obtaining de-

---

out Wisconsin, and in fact, the nation. Instead, this is a case in which the Government's expert admitted that the defendants were not operating in the same geographical markets, the defendants proved that the combined banks did not compete against each other, and a survey of bank customers themselves showed that such competition did not exist. In addition, at the second trial it was proved that the difference in interest rates (or conversely, risks) between Los Angeles and the Bay Area was further proof that they are different markets (Goodman, Tr. 2198).

Neither can it be said that California is "any section of the country", in which Crocker and Citizens were competing against each other and in which the merger could reduce competition, as in *Pabst*. The fact that beer manufactured in Milwaukee can be sold not only throughout Wisconsin but throughout the nation (e.g., Miller's High Life "brewed in Milwaukee") does not mean that the same is true of banking services. Plaintiff has successfully and correctly proved that banking services are primarily local and that banks do business where they have offices.

30. Copies of the reports of the regulatory agencies and the Department of Justice letter referred to are attached to the Memorandum of Crocker-Anglo National Bank and Citizens National Bank in Opposition to Motion for Preliminary Injunction filed herein on October 8, 1963.

posit data for every bank in every area in the state. On the basis of that study and experience, he reached the same conclusion as to which he testified for the Government in the *Philadelphia* case: banking markets are local, national and international. His opinion was that the state is neither a local market nor a relevant section of the country for the purpose of judging the effect of a change among competitors in the instant case. The court concurs in this view.

The defendant banks' expert, Professor Weston, qualifies as one of the leading financial experts in the country. His opinion that the state was not a market was supported not only by his experience but by his survey.

■ We find that the substantial weight of the evidence shows that there was no statewide market for Crocker or Citizens. If there was no statewide market for Crocker or Citizens or for any bank that did not have branches throughout the entire state, the fact that Bank of America had over 800 branches scattered throughout the state and in every county and that two other banks to a lesser degree had branches in many counties throughout the state does not thereby convert the entire state into a meaningful economic market. All that you actually have is three banks able to service numerous local markets throughout the state.[31]

---

**31.** As to banks able to give local services throughout the state, Professor Weston testified:

> JUDGE ZIRPOLI: This is what is disturbing me. If you have a capacity to mobilize throughout the state in this fashion, such as Bank of America can do, why can it not be said that there is a relevant market, certainly as far as the Bank of America is concerned in the state of California.
>
> THE WITNESS: For the reason that with regard to mobilizing funds, a bank is able to mobilize funds to the extent that it can locate offices to generate the acquisition of the funds.
>
> Now, the flow of funds into California, however, comes from outside the state as well, so even focusing on the flow of funds, the flow of funds market is a national market because insurance money flows into the state, and so the point I am making is that in a capital deficit state in the supply of funds market that is national it is still desirable from the standpoint of that state to mobilize as effectively as possible the funds within the state area since the state must depend for financing its business and commercial and individual activities in substantial measure on funds outside the state, and I am saying that it is important that the funds within the state be mobilized as efficiently as possible. But this doesn't indicate that this market is statewide because you have a flow of funds from outside the state from numerous types of institutions.
>
> MR. ARCHER: Q. Well, Professor Weston, what would you say about a state-wide market from the standpoint of a company that wanted to deal with only one bank in the state and had facilities throughout the state which could be served only by the Bank of America? Would you consider that to be a market or—how would you consider that?
>
> A. I would not consider that a market either. There is a distinction that must be drawn between the performance of a particular type of banking service and the existence of a market. For example, the national banking divisions of banks in California in seeking to obtain business in California from national accounts will stress the services that they can perform in California for these customers in connection with their California business. Nevertheless, they still have to compete with out-of-state banks for the business of those national accounts in California, so that even though Bank of America might have the U.S. Steel account, it is subject to continuous competition with the Chicago and New York banks to handle the U.S. Steel account both nationally and even for their California activity.
>
> Q. Well, suppose U.S. Steel, however, determines from the standpoint of its own policy that it is going to have its deposits made daily and its payrolls paid from its various locations in California: In Pittsburg, San Francisco, Los Angeles and Torrence?
>
> A. Well, then, when you talk in those terms, I can see a basis on which one might argue that in connection with these services that there exists a market in some sense. But in that market you have only the Bank of

While it may very well be true, as plaintiff contends, that commercial banking can appropriately be divided into three geographic areas, local, regional and national, the test as to whether any given geographic area is a relevant (economically significant) market or section of the country is not based on political boundaries, but is based on economic grounds. Therefore, even though the laws of California permit statewide branching, this factor, which undeniably must be considered, does not in and of itself make the whole of California a relevant market or section of the country in which to measure the competitive effects of a merger. The same can be said for the whole of the State of New York. Permissive statewide branching merely extends the political boundaries in which a bank may open branches, local units, to operate in local markets. It does not bring to any particular bank or banking unit depositors or borrowers from all over the state. "Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their business at a distance." United States v. Philadelphia Nat. Bank, supra, 374 U.S. at 358, 83 S.Ct. at 1738. Persons and corporations in San Diego do not normally deposit their funds in San Francisco or Sacramento. Persons and corporations in San Diego do not normally borrow from banks in San Francisco.

When a customer's deposits become of real magnitude or his loans get into the category of $100,000 or more (which some economists use as an indicium of wholesale banking), cross-elasticity comes into play and extends the geographic limits and the field of financial institutions to which such depositors or borrowers will go. They will go where they can get the maximum return on their deposits and borrow from those who are prepared to take the risk at the lowest possible interest rate. The market then becomes national. These very factors prompted Professor Weston to conclude "that from an economic standpoint there is not a statewide commercial banking activity." (Tr. 1489).

As to plaintiff's contention that the application itself established the state as a market in which Crocker and Citizens competed against each other, the Comptroller to whom it was submitted did not so understand it (BK–A, p. 34). The fact that the resulting bank, Crocker-Citizens, would compete (a) in the area where Citizens competed prior to the merger, (b) in the area where Crocker competed prior to the merger, and (c) with banks which offer statewide banking facilities, does not mean that each of the merging banks was competing in *all* of these respects prior to the merger (Ct. 195, Exh. 13, pp. 1, 7). The references to the dependence of both banks, for their future growth and strength, "upon their ability to extend their services throughout the major commercial areas of California—the North and South,—as demanded by the needs of their present and potential customers", were expressly related to the necessity from a bank's standpoint of having offices where the need arises in a growing and industrially expanding state (Ct. 195, "Application for Approval of Merger", pp. 5, 6; Exh. 13, pp. 74, 87). One cannot fairly imply from the application that there is anything in California's economy which destroys the local nature of banking services. The substance of the entire application is clearly to the contrary; each bank desired to merge in

America, United California Bank, and, to some degree, First Western. This merger would add a fourth competitor to that market, if that market exists at all, and if that is regarded as a market under some definition, then this merger would decrease competition (sic) because it would add a fourth bank to a bank service activity in

which only three banks exist today.

JUDGE POPE: You said "decrease competition".

THE WITNESS: "Decrease concentration." I'm sorry.

Increase competition and decrease concentration.

(Weston, Tr. 1584–1587, line 3)

order to have officers in areas it was then unable to serve (Ct. 195, Exh. 15–J, pp. 4–11). In a sense each bank wanted to further emulate the Bank of America and take advantage of the benefits of commercial banking by offering the essential ingredient of "convenience" in more local markets throughout the growing and expanding state.[32]

The court concludes that the State of California as a whole is not a relevant market or section of the country in which to measure the competitive effect, actual or potential, of the instant merger. Nonetheless, bearing in mind Professor Weston's observation (note 31, supra) that the services rendered by a bank operating a statewide system may be "a market in a sense" or "a market under some definition", the court, in order to finalize all the issues presented, will hereinafter assume the entire state to be a relevant market or section of the country and evaluate the competitive effect of the merger in such assumed market.

## THE LOS ANGELES METROPOLITAN AREA.

Inasmuch as there was no competition between Crocker and Citizens in either the Los Angeles metropolitan area (Los Angeles and Orange counties) or the San Francisco Bay area (City and County of San Francisco and counties of Alameda, Contra Costa, Marin and San Mateo), the instant merger could not have affected actual competition in either of these assumed markets; however, since the main thrust of the Government's claim is that this merger forecloses potential competition, and will result in a "reasonable likelihood" of a substantial lessening of compensation in these sections, as well as in the whole of California, the court deems it advisable to review the economic realities in these sections in terms of "the business of banking".

Subsequently in this opinion we will call attention to the facts which demonstrate that potentially Crocker would not have entered the Los Angeles metropolitan area and that Citizens would not have entered the San Francisco Bay area. Accordingly, while Citizens may have had prior mergers in what plaintiff asserts to be the Los Angeles metropolitan area, and Crocker may have had mergers in certain counties of the San Francisco Bay area, we do not see how these can be relevant in adjudicating the validity of the instant merger which does not involve the same markets.

Plaintiff proved many things about the population, business and industries of metropolitan Los Angeles and the rate of its growth, but the essential thing it failed to prove is that the Los Angeles metropolitan area, as defined by it to in-

---

32. The Bank of America grew to be the largest private bank in the world because its founder, A. P. Giannini, the greatest innovator in modern banking, recognized the need to serve "the little fellow" and understood that this could be effectively accomplished only through local branches offering a "convenience of location" to persons of moderate means. That is why the House of Morgan declined as the Bank of America came up. J. P. Morgan, the elder, was the banker for men of great wealth. Giannini was the banker for the locomotive fireman, who worked on the railroad systems Morgan unified, and the puddlers in the Morgan-financed steel mills. The times favored Giannini and the leveling process, as far as money goes, less for the Haves and more for the Have Nots, proved to be a good thing for branch banking, for the Bank of America and for California. And it is still the "convenience of location" through its branches serving local needs that makes the Bank of America strong. It should be noted further that neither the dominant Bank of America, nor either of its two smaller statewide competitors, United California Bank or First Western Bank and Trust Co., was the product of *de novo* branch banking. Each achieved statewide status essentially through mergers, and in the case of United California Bank, as pointed out above, with the approval of the Department of Justice, FDIC and the Federal Reserve Board. This court is of the view that, giving proper consideration to problems of allocation of permits by the regulatory agencies, costs, location, personnel and the training thereof, it would not have been feasible to have created, as of this date, a truly statewide system of branch banking.

clude Los Angeles and Orange Counties, is in fact a relevant market in "the banking business".

■ The opinion of plaintiff's expert, Gaffey, that Los Angeles and Orange Counties constituted a banking market was based upon the fact that the Bureau of the Budget at one time included those two counties in its definition of the Los Angeles-Long Beach Standard Metropolitan Statistical Area (Gaffey, Tr. 924–926). At the time of the Crocker-Citizens merger, however, such was not the case. The Bureau of the Budget itself states that standard metropolitan statistical areas are not intended to be market areas, and Gaffey testified that the geographic boundaries of those areas are often determined by factors wholly unrelated to those which would determine a market area. Gaffey also relied on the fact that Citizens conducted its business in Los Angeles and Orange Counties, but Citizens also had branches in San Bernardino and Riverside Counties which were located so close to Los Angeles as to be considered a part of Los Angeles metropolitan area. Plaintiff's reliance on economic data relating solely to Los Angeles County certainly does not prove that Los Angeles and Orange Counties together constitute a single banking market.

■ Another factor which Gaffey relied upon as establishing Los Angeles and Orange Counties as a relevant banking market was the fact that the banks, in their application to merge, represented that the State of California lends itself to a rough division into nine more or less distinct geographical and economic areas, including one demoninated the Los Angeles metropolitan area and composed of Los Angeles and Orange Counties (Ct. 195, Exh. 13, pp. 72, 73; Gaffey, Tr. 926, 927). Nowhere in the application did the merging banks characterize any of those so-called economic areas as banking markets or submarkets, and the fact that an area might constitute a market for the manufacturing and commerce activities of a bank's customers does not establish it as a banking market.

Plaintiff's reliance on economic data relating solely to Los Angeles County as evidence that Los Angeles and Orange Counties constituted a single banking market is unfounded. Data relating to one county cannot prove that two constitute a banking market.

Professor Goodman was of the opinion that the Los Angeles metropolitan area includes many local markets but is not itself a banking market (Tr. 1836). We agree. A banking office on Wilshire Boulevard would not be in competition with banking offices in other parts of Los Angeles County, let alone Orange County (Rhorer, Tr. 1357–1358).

■ In any event, Los Angeles and Orange Counties, separately or together, are not appropriate markets within which to judge the instant merger because, as plaintiff's experts admitted, the instant merger did not change the banking structure in any community within those counties.

THE SAN FRANCISCO BAY AREA.

Plaintiff contends that five counties in the San Francisco Bay area, the City and County of San Francisco, Alameda, Contra Costa, Marin and San Mateo, constitute a relevant market to be used in testing the competitive effects of the Crocker-Citizens merger and that it was the relevant market to be used in testing the competitive effects of the 1956 consolidation of Crocker First and Anglo California. On its very face, the suggestion that those five counties constitute a Bay area market violates the mandate expressed in *Brown Shoe* that geographic markets must be a product of "commercial realities", rather than a "formal, legalistic" approach. Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 336, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). What possible basis can there be for drawing the boundaries of the so-called San Francisco Bay area market so as to include communities like Antioch and Pittsburg in Contra Costa County, while excluding Palo Alto and Los Altos in Santa Clara County? The San Fran-

cisco Bay is bordered by nine counties; namely, Marin, Sonoma, Napa, Solano, Contra Costa, Alameda, Santa Clara, San Mateo and the City and County of San Francisco. Prior to October 18, 1963, the San Francisco Standard Metropolitan Statistical Area, as defined by the Bureau of the Budget, encompassed six of the nine counties bordering the Bay, namely, Alameda, Contra Costa, Marin, San Mateo, Solano and the City and County of San Francisco. The San Francisco Bay area is normally regarded as including also Santa Clara as well.

In asserting that the five counties constituted a market for judging the Crocker First—Anglo California consolidation, plaintiff's witness, Dirlam, based his opinion on three premises, none of which supports his conclusion that such a market existed or that if it did exist, it was limited to those five counties. One of the factors he relied on was that the five-county area was the area in which Crocker First and Anglo California had offices. Neither bank had offices in all five counties, and Anglo California, in addition to its offices located in other more remote counties, had offices in the other two Bay area counties of Santa Clara and Solano. The second factor on which Dirlam relied consisted of data designed to show that some of the Bay area offices of each consolidating bank derived the bulk of their business from customers having record addresses in those five counties. None of the tables, however, included data showing the record addresses of customers of Anglo California's Bay area offices in Palo Alto and San Jose in Santa Clara County, and Vallejo in Solano County. Whatever they may have shown, if anything, they did not provide a rational basis for excluding either Solano County or Santa Clara County. The only other factor which Dirlam cited as showing a five-county market was his belief that these five counties constituted the San Francisco Standard Metropolitan Statistical Area, as defined by the Bureau of the Budget at the time of the Crocker First—Anglo California consolidation. In that, too, he was mistaken.

There was even less reason for restricting the San Francisco Bay area market to five counties at the time of the Crocker-Citizens merger. By that time the Bay area counties in which Crocker-Anglo did business had increased from six to nine. There was no evidence that the bulk of the banking business of its offices in nine Bay area counties was derived from customers located in only five of those counties. While it is true that the Bureau of the Budget changed its definition of the San Francisco Standard Metropolitan Statistical Area less than two weeks (October 18, 1963) prior to include only the five counties, Gaffey testified that such changes are frequently made for reasons wholly unrelated to those which would be determinative of a market area (Gaffey, Tr. 925, 926). Also, we doubt that plaintiff contends that the Bay area market was growing smaller. In this connection, we would point out that the larger the San Francisco Bay area market is assumed to be, the smaller would be the effect of the Crocker First—Anglo California consolidation and the acquisition of the San Rafael banks.

 As in the situation applicable to the Los Angeles metropolitan area, this court finds that the San Francisco Bay area includes many local markets and that some of these local markets may include parts of an adjoining county (e. g., the San Francisco market overflows into and encompasses the adjoining San Mateo County communities of Daly City, Colma and South San Francisco, with no discernible indication of where one stops and the other begins), but the San Francisco Bay area in and of itself, whether we include five, six or all nine counties bordering the Bay, is not a banking market.

In any event, it is admitted that the instant merger did not change the struc-

ture of any Bay area banking markets, regardless of which counties are in the Bay area.

## THERE WAS NO COMPETITION BE-TWEEN CROCKER AND CITIZENS IN ANY OF THE RELEVANT MARKETS REFERRED TO IN THE COMPLAINT.

 There was no competitive overlap between the merging banks. Plaintiff offered no substantial evidence of actual competition between Crocker and Citizens in any of the relevant markets referred to in the complaint. As Dirlam testified, banks can never engage in very substantial competition in areas where they do not have offices (Dirlam, Tr. 875–876). The nature of banking markets is peculiarly local in California because of the large number of banking offices operating in virtually every area of the state. Customers in one community have no need to, and ordinarily do not, go to another community to do their banking and in many localities the number of banking offices is such that customers will not consider doing their banking at an office more than a few city blocks distant. California has in excess of 200 banks and about 2400 branches, local banking offices (Saxon, Tr. 2051).

There was no evidence that any branch of Crocker was so located as to be in competition with a branch of Citizens. There was no city, town or community in which both banks had offices. Ventura County was the only one of California's 58 counties where both banks had an office at the time of the merger. The Thousand Oaks office of Citizens was some 23 miles northwest of and outside the service area of the Ventura office of Crocker and outside the service area of the subsequently established office of Crocker in Oxnard and of the town of Camarillo, where it was denied a permit. Even if that were not true and even if it were assumed that there was competition between one

or even both of the Crocker offices in Ventura County and the Citizens office at Thousand Oaks, such competition was insignificant. By June 1964, these three offices of Crocker-Citizens had only $\frac{7}{10}$th of 1 per cent of the total deposits in Ventura County (BK-EE).

The California Superintendent of Banks found that Crocker and Citizens were not in competition and their merger would not lessen competition (BK-A, p. 44).

 From the standpoint of economics, evidence of the record addresses of customers shows nothing as to competition or the areas in which either bank did business. The fact that the banks had customers with record addresses in areas where the other bank had offices did not indicate that either bank was performing a service at the location of the record address. Likewise, the fact that each of the banks had the same customers did not indicate that they were competing for the business of that customer. Either the banks were performing local services or they were competing for this business with most of the other banks in the country. The same would, of course, be true for correspondent bank customers; Citizens could not provide collection or other services in San Francisco nor could Crocker provide such services in Los Angeles.

Plaintiff, of course, argues to the contrary, but the argument sounds strange indeed coming from plaintiff. One of its experts testified that the record address of a bank's borrower does not delimit the market within which the bank is doing business, and its other expert testified that the services performed for such customers were performed in the vicinity of the banking office and not the address of the customer (Dirlam, Tr. 533; Gaffey, Tr. 1067–1068).

Plaintiff's expert staff economist, Gaffey, testified that the question of whether there exists a class of customers

in a statewide market is a subject of observation and not a subject of hypothesis (Tr. 1004). He further testified that such customers could be identified (Tr. 1001–1002), and that it was his business as an expert to engage in such work (Tr. 1003). Defendant banks submitted to the plaintiff thousands of names of their customers, and this court entered an order requiring plaintiff to identify every customer of which it had knowledge for whose business Crocker and Citizens competed. Notwithstanding all this and the burden of proof which rests with plaintiff, *plaintiff was unable to identify any customers for whose business the two banks competed,* other than those in the national market, such as Tidewater Oil Company and C.I.T. Corporation.

 By reason of the foregoing, as we stated in the beginning of this opinion, the court finds that Crocker and Citizens were not in actual competition prior to or at the time of the merger in any relevant market alleged in the complaint.

## THE MERGER DID NOT INCREASE CONCENTRATION IN CALIFORNIA.

 Concentration is a function of a market. As stated in *Brown Shoe,* combinations are to be gauged on "their effect on competition generally in an economically significant market." 370 U.S. at 335, 82 S.Ct. at 1529. Unless they relate to a market, both in the geographic sense and in the line of commerce (or functional sense), figures purporting to show concentration ratios are meaningless.

Plaintiff's and defendant banks' experts all agreed that the instant merger did not increase concentration in the local markets (Dirlam, Tr. 676; Gaffey, Tr. 1085–1086 and 1097–1099; Weston, Tr. 1491, 1625–1626).

 The evidence in the instant case, including the Weston survey, his ten year study of the question, and Goodman's investigation, shows that the characteristics of California borrowers with state mobility are such that they have national mobility and are in fact in the national market. It follows that there is no statewide banking market in California, that plaintiff's state-wide concentration ratios are, in the words of David A. Alhadeff of the Bureau of Business and Economic Research of the University of California,[33] "meaningless, or worse", and that the merger of Crocker and Citizens could not possibly have increased concentration. Nevertheless, we will consider plaintiff's concentration figures.

---

33. The concentration statistics in this chapter are highly unorthodox. Conventional concentration statistics in the field of banking are usually computed on a legalistic or political-jurisdictional base; hence, the common practice of showing concentration of banking resources on a statewide basis. Statistics computed in this manner may conceivably serve legalistic or political purposes. For economic analysis, such statistics are meaningless, or worse. It is only by chance that statistics thus computed may sometimes find a place in economic investigations." (Alhadeff, Monopoly and Competition in Banking, at p. 52, (1954)).
The fallacy of using concentration figures *alone* to measure the impact of a merger in bank cases was pointed out by Chief Judge William E. Miller in the *Nashville* case referred to in note 1, supra. In United States v. Third National Bank of Nashville, D.C., 260 F.Supp. 869, 883, he said:
 As already stated, no reliable extrapolation as to future prospects may safely be predicted upon concentration or market share figures alone. But considering the totality of facts as to the institutions involved and as to the relevant market, a conclusion that the merger may substantially lessen competition in the future is wholly unwarranted. Any other view would require the Court to close its eyes to facts which are far more convincing than any possible contrary conclusions which could be drawn from the market share or concentration statistics in this case.

The following table, adapted from Government's Exhibit 30A, shows the percentages of total deposits of all banks of the state held by the largest banks before and after the merger.

DISTRIBUTION OF DEPOSITS IN CALIFORNIA BANKS AS OF END OF YEAR 1962 AND 1963

| | 1962 | | | 1963 | | |
|---|---|---|---|---|---|---|
| | Rank In California | % of Total California | | Rank In California | % of Total California | |
| | | Each Bank | Cumulative | | Each Bank | Cumulative |
| Bank of America | 1 | 39.9 | 39.9 | 1 | 40.6 | 40.6 |
| Security First National | 2 | 13.5 | 53.4 | 2 | 12.7 | 53.3 |
| Wells Fargo | 3 | 9.9 | 63.3 | 3 | 9.6 | 62.9 |
| United California Bank | 4 | 8.0 | 71.3 | 5 | 8.0 | 80.1 |
| Crocker | 5 | 7.4 | 78.7 | 4 | 9.2 | 72.1 |
| Union Bank | 6 | 3.1 | 81.8 | 6 | 3.2 | 83.3 |
| Bank of California, N.A. | 7 | 2.6 | 84.4 | 7 | 2.7 | 86.0 |
| Citizens | 8 | 2.5 | 86.9 | Merged with Crocker (11–1–63) | | |
| First Western | 9 | 2.0 | 88.9 | 8 | 1.9 | 87.9 |
| All Other Banks | 10–129 | 11.1 | 100.0 | 9–155 | 12.1 | 100.0 |

◆

■■ The foregoing table, dominated by the Bank of America figures, clearly shows how meaningless the Government's figures are, since the concentration arises not by reason of the deposits of the next leading seven banks (or the remaining 154 banks) in 1963 but because of Bank of America's 40.6 per cent. The concentration is caused by Bank of America. No one of the other banks is responsible for the concentration. Bank of America alone or Bank of America in combination with even the smallest bank would be concentration. That is why Professor Goodman said that using a table of this character without giving proper consideration to Bank of America's dominance is like using a giant with a group of eight pigmies to show the average size of nine men. It just doesn't make sense. Furthermore, it will be noted that as of the end of 1962 the seven next leading banks combined with Bank of America showed a cumulative percentage total of 86.9 per cent, and at the end of 1963 the seven next leading banks combined with Bank of America showed a cumulative percentage total of 87.9 per cent, a gain of 1 per cent; however, since Bank of America's deposits rose from 39.9 per cent at the end of 1962 to 40.6 per cent at the end of 1963, we find that Bank of America's deposits account for 70 per cent of this 1 per cent increase. This change, based upon commercial banking alone as the line of commerce, and without consideration of those factors heretofore set forth which call for an expansion of the line of commerce when we consider the state as a whole as the market, completely fails to satisfy this court that such change reflects a substantial lessening of competition in commercial banking. It should be noted that the fact situation presented by the present record is quite different from that which was presented in United States v. Philadelphia Nat. Bank, supra. In that case the merging banks were not only located in the same city and direct competitors of each other, but the result of the merger was a significant concentration with the merged bank controlling at least 30 per cent of the commercial banking business in the relevant area. The merger there would have resulted in an increase of more than 33 per cent in concentration (374 U.S. at 364–365, 83 S.Ct. 1715). Here, in contrast, Crocker-Citizens would have 9.7 per cent (using the figures 7.2 per cent for Crocker and 2.5 per cent for Citizens, as used throughout the trial, rather than the combined figure of 9.2 per cent reflected in Government's Exhibit 30A on which the foregoing table was prepared) of the deposits in the relevant area. This reflects an increase of Crocker's percentage of deposits by 2.5 per cent through the addition of the de-

posits of Citizens. In view of these statistics and the extent of the other banks listed in the foregoing tabulation, there can be no inherent likelihood that competition will be substantially lessened, for it is readily obvious that the merger will not produce a bank controlling an undue percentage share of the relevant market and will not result in a significant increase in the concentration of banks in that area. Furthermore, as we previously noted, had the Government employed the statistical method employed in its Exhibit 32 in the *Philadelphia* case (here note 26), there was no perceptible change in concentration by reason of the instant merger.

Also, as we previously noted, the Government's figures are misleading and fail to make necessary adjustments. The Government's figures show the ratio of Citizens' loans and discounts to be 2.1 per cent on all California loans and discounts before the merger, with that of Crocker at 7.2 per cent for a total for Crocker-Citizens to be 9.3 per cent; however, if we adjust this figure for loans and discounts for out-of-state banks, as was done in the *Philadelphia* case, we find that the combined figure of 9.3 per cent tabulated by the Government should be reduced, as Professor Weston satisfactorily demonstrated, by 28.78 per cent and we arrive at a figure of 6.6 per cent. And if we apply the same percentage adjustment to Crocker-Citizens' percentage of total deposits of all California banks, we arrive at a figure of 6.8 per cent of total deposits.

■ An adjustment for available resources of foreign bank subsidiaries and representatives, as we previously noted, would result in a further reduction. Since no one can realistically compute or even estimate the extent of this reduction, we reject defendant banks' exhibit BK–2, table 3, and Professor Goodman's finding that an adjustment for both out-of-state banks *and foreign banks and agencies* would reduce Crocker-Citizens' share of the relevant market to 3.8 per cent. We find no need to adjust for this further unknown figure, since we are

clearly satisfied that on the Government's figures alone the record fails to reflect a merger controlling an undue percentage of the relevant market.

More significant than any of the foregoing is the fact that if the competitive impact of the instant merger is to be meaningfully measured in plaintiff's hypothetical state market (in which convenience is no longer the important factor), cross-elasticity comes into play and increases the degree of substitutability of products of other financial institutions and thereby appropriately extends the line of commerce to meet the realities of this extended market. In our previous review of this wider field in which other institutions compete with commercial banks for the savings and investment dollar or for the extension of credit, we found that in 1962 Crocker and Citizens combined held:

(1) Only 2.63 per cent of the total of California savings;

(2) Only 1.34 per cent of the total of California farm mortgage loans;

(3) Only 2.7 per cent of California agricultural loans;

(4) Only 1.8 per cent of California mortgage debt on non-farm real estate (this is a rather significant figure when one considers that savings and loan associations held $13.9 billions of such loans as against $5.9 billions for commercial banks);

(5) Only 2.8 per cent of California business loans and credits; and

(6) Only 5.56 per cent of California's installment and non-installment consumer credit.

■ If the foregoing inter-institutional competition is taken into account, the combined share of Crocker and Citizens in each of these savings and lending activities in no case exceeded 5.56 per cent of the total in the case of installment and non-installment consumer credit, and in the case of real estate loans dropped as low as 1.8 per cent of the total. These figures, which are unchallenged, call for a conservative adjustment of plaintiff's concentration figures to at least one-half

that fixed by the Government (if not to less than 2 per cent, as claimed by defendant banks). A market share of this limited magnitude can have no adverse competitive effect in a market like California with in excess of 200 banks and over 2400 branches and where ease of entry and demands for entry are probably greater than in any other section of the country.[34]

Finally and before leaving our discussion of California as a relevant market, we find persuasive the testimony of the Comptroller[35] that, if there is a state market for some form of banking service, yet to be clearly defined and identified, at the time of the merger there were three (if not only two) competitors in that market, and the testimony of Professor Weston that *the merger,* if

34. In this regard we note that one of the most significant of the Court's findings in *Philadelphia Bank* is absent, indeed is negatived here. The number of banks in the Philadelphia area had been dropping precipitously, from 108 in 1947 to 42 in 1961. But in California, the number of banks and trust companies rose from 117 in 1960 to 200 in 1964. (Annual Report of FDIC (1964), Chart on p. 144 measuring changes between December 31, 1960 and December 31, 1964). This *important factor runs directly contrary to plaintiff's theory of reduction of consumer choice.

35. The Comptroller testified:

A. This case was the subject of long, extensive public hearing by our office, during which these factors were gone into at great length by various witnesses.

One of the prime considerations was the question of possible lessening of competition, and our conclusion at that time was that there were no two offices—or no single office, indeed, of these two institutions which were in competitive conflict, and therefore there was no competitive overlap and there could not be any elimination of competition, and certainly, a fortiori, any substantial lessening of competition in the circumstance. This same factor applies here today, since the adoption of the new Bank Merger Act.

Additionally, we have, as reaffirmed, in terms in the balancing test provided by the new statute, in other words, that the convenience and needs to the public clearly out-weighs any lessening of competition, we affirm that the convenience and needs is amply demonstrated and will be more and more so in the years ahead; that while the Bank of America, as it sits in this banking structure in California, has done a formidable job, one not matched by any other commercial bank in the country, and a bank which I would in no sense ever derogate, does sit in a dominant position in this banking structure with competition of any effective sort arising only from one bank, namely, the United California Bank.

I do not believe, on the basis of our day-to-day examination of and dealings with banks, that the First Western Bank and Trust Company, as alleged, is a substantial state-wide competitor and I do not believe that anyone who follows this developing picture here could so demonstrate.

So that we are faced here with one really great institution, not only domestically, but internationally, the Bank of America, with but one formidable state-wide competitor, as that term is so loosely used throughout the parlance of antitrust law, in this case and also the banking business. I say the United California Bank because it, as the keystone of a large bank-holding company, the largest in the United States, Western Bank Corporation, actually has a competitive reach far exceeding any bank short of the Bank of America. Reaches into 12 states and more than 25 banking institutions, and has the benefit of controlling the flow of loans and deposits and new business and other developments.

Accordingly, we would change our opinion, original opinion, to the extent of stating that the merged bank is not the fourth largest bank as the result of the merger but, indeed, the fifth, since the United California Bank resource position would have to be measured by substantially all of the resources of the Western Bank Corporation amounting now to close to $7 billion, which would put it next to the Bank of America in size.

Accordingly, therefore, it seems to us, as this matter has been continuously reexamined, that this merger affords the only second substantial possibility of founding a substantial, quote, state-wide, unquote, competitor to the Bank of America.

(Tr. 2036–2038)

it affected competition at all, *in the California market "increased competition and decreased concentration."* The merger served an immediate need, which even the Government on more than one occasion conceded, by giving us a fourth competitor among the banks capable of giving statewide service *now* and not ten or twenty years from now by *de novo* branching, assuming contrary to past history that this could be done.

## THE LARGE NUMBER OF SUCCESSFUL NEW ENTRIES DISTINGUISHES MARKETS IN CALIFORNIA.

For the period January 1, 1954 to December 31, 1964, 706 new banking office entries were made in 375 different communities in California; 91 of these were by Crocker-Citizens or its predecessors (BK–H; BK–I; BK–J). This is dramatic evidence that the banking system in California provides more banking alternatives where they are needed than do the banking systems found elsewhere in the United States. In the very years during which plaintiff asserts that the number of banks was declining, the number of competing banks in banking markets throughout the state was increasing substantially. This is true in particular of every community in the San Francisco Bay area, the Los Angeles metropolitan area, Kern County, Santa Barbara County and Ventura County (BK–M—BK–Q).

During the period 1953 through 1964, 120 new banks were established and accumlated over $1.5 billion in deposits and established 208 banking offices, including their home offices. (BK–J). Since the Crocker-Citizens merger, some 20 new banks have been established in Los Angeles and Orange Counties alone (BK–I). These new banks have shown progressively larger annual increases in deposits during each of the last five years. Their rate of growth has exceeded that of California banks generally. In fact, the seventh largest bank in Los Angeles and Orange Counties as of December 31, 1962, was the City National Bank of Beverly Hills, which was established in 1953.

By way of contrast, in *Philadelphia* the number of banks had declined by more more than 50 per cent (374 U.S. at 331, 83 S.Ct. 1715), and in the ten-year period ending in 1961, only one new bank had opened in the Philadelphia four-county area, and it was established in 1951. (374 U.S. at 367 n. 44, 83 S.Ct. 1715). In *Lexington,* there were only four other banks and apparently no new entries (376 U.S. at 668–669, 84 S. Ct. 1033). In *Manufacturers Hanover,* there had been a 38.6 per cent decline in the number of banks, and in the decade prior to the merger only two new banks had opened and they were established by existing banks (240 F.Supp. 867, 943).

█ It is apparent from plaintiff's own exhibits that the only limit to the number of banking offices in any area is the number of offices which the banking authorities will permit (B–22A; G–23). In every year, the number of applications has far exceeded the number of permits and charters granted (G–37). The fact that in years when the number of permits increases, there are a still larger number of denials, demonstrates that the only reason there aren't more denials is that those seeking new offices and new charters are discouraged from applying more frequently than they do. In view of the large number of denials during 1963 and 1964, it would appear that applications will exceed the number of permits which plaintiff predicts will be authorized prior to 1980 by close to 500 per cent (BK–K; BK–L; G–23A). These facts only serve to confirm the Comptroller's views of the matter (BK–A, pp. 50–53, 59–60). Accordingly, it is pure speculation, if not nonsense, to say that the merger caused a reduction in the potential number of banking alternatives in any area of the state, even if it could be assumed that Crocker or Citizens had formulated a definite plan to establish offices in the service area of the other. For example, plaintiff's expert, Gaffey, could offer no satisfactory basis for concluding that Crocker would`have, by *de novo* branching, accumulated a larger market share than the new banks which

were in fact established in Citizens' service area after the instant merger (Gaffey, Tr. 1089-1093; cf. Dirlam, Tr. 841). And can anyone now say that the regulatory authorities would have authorized those new banks had the merger not occurred or that they would have permitted the establishment of those banks and a substantial number of Crocker offices as well? Cf. Dirlam, Tr. 735, lines 1-9).

Plaintiff and its experts admitted the truth of the proposition that no area will be lacking an alternative banking office because of the merger (BK-AA, Nos. 84, 85). That being the case, the number of different banks in any banking market in California will not be determined by how this court decides this case. It will be determined, instead, by whether the regulatory agencies decide to permit a new branch or to charter a new bank and what selection they make among the various banks or promoters applying. This is not a situation where there are only four *(El Paso)* or six *(Penn-Olin)* actual and potential competitors. In such cases the court might properly concern itself with effect of mergers in stifling internal growth. In this case, however, there are more people knocking at the door than can possibly be admitted.

## NEITHER BANK HAD APPROVED PLANS TO ENTER NOR WAS IT FEASIBLE FOR EITHER TO ENTER THE SERVICE AREA OF THE OTHER.

Plaintiff argues that the evidence in this case shows that but for its merger with Citizens, Crocker would have expanded *de novo* and become competitive in the highly concentrated Los Angeles metropolitan area.[36] This it asserts is the most important issue in the case. It further argues that the evidence also shows that but for its merger with Crocker, Citizens would have expanded *de novo* into the service area of Crocker. The substantial facts to which plaintiff refuses to give consideration are that neither bank would have moved into the area of the other *de novo;* that it was neither desirable nor feasible to do so; and that even if they wanted to, the Comptroller would not have permitted any of the entries needed to create a statewide system.

As a result of the hearing after remand, we have before us not only the official report of the Comptroller that he would not have permitted Crocker to branch into Los Angeles and Orange

36. Long after this case was submitted on briefs counsel for plaintiff sent to each member of this court copies of articles from The Wall Street Journal and the American Banker of June 9, 1967. These articles, which are identical in language, state that Wells Fargo Bank, with its main office in San Francisco, announced plans for a major *de novo* branching campaign in Southern California, which *if successful*, would give California its sixth statewide commercial bank. The President of the bank said the campaign program *"probably* will get started early in 1968, with the opening of *a* major Los Angeles headquarters." The program calls for the annual establishment of five or six offices. The sending of these articles to influence the court is of questionable propriety. They form no part of the record in this case, are hearsay, have not been subject to cross-examination, contemplate the opening of *a* branch *five years after* the instant merger, and their presentation to us *now* is rather presumptuous, when we consider that during the discovery pro-

ceedings and in the course of the trial of this case plaintiff branded as "irrelevant" its files on Wells Fargo.

Furthermore, the establishment of a branch in Los Angeles in 1968 and a program for the possible establishment of five or six branches thereafter annually, even if a true expression of the bank's intent, proves nothing of true relevancy to this case, except possibly that if successful in its campaign to get permits (in an already overcrowded area where many others besides Wells Fargo will be permit applicants), locations and personnel, it can hope to have enough branches to qualify as a statewide in ten or twenty years, or, as the Comptroller put it, "it would take Wells Fargo 136 years to become a branch by branch statewide competitor with Bank of America". As we previously stated, the need for another competitor to the Bank of America was already urgent at the time of the merger, November 1, 1963, and not one to be achieved ten or twenty or 136 years thereafter. (Italics ours).

Counties on any basis which would have made a *de novo* entry economically worthwhile to applicant, but also the testimony of the Comptroller tested by cross-examination to the same effect. Important sections of the metropolitan areas have in effect been closed to additional branching by the regulatory authorities (Saxon, Tr. 2041, 2048). In addition, preference in establishing branches in those areas will be given to the newly established small banks (Saxon, Tr. 2058–2059).

During 1965 the number of applications for new branch offices throughout the state exceeded the number of applications granted by 60 per cent (BK-LLL; Stipulation of Counsel, Tr. 2229–2230). If anything, the excess of applications was higher in Los Angeles. In 1965 the number of applications for new branch permits and new bank charters in Los Angeles which were denied exceeded the number of new banking offices established (BK-LLL; G-360).

■ The effect of the loss of the mere presence of a potential competitor, even of the size of Crocker, on the periphery of the Los Angeles market is minimal at best. The fact that competition was already vigorous, that there were at least 75 to 80 banks operating in the area, that the number of banks had increased by 50 per cent in two years, that there were at least two applications for new banking offices for each permit that became available, and that the potential competitors included some of the world's largest banks, shows that the presence or absence of one potential competitor could have no material effect upon the conduct of those competing in the market, no effect upon the tone of competition in the market and no effect upon the price or supply in that market. There are more than enough banks in and around the market, ready, willing and able to take advantage of every competitive opportunity that might become available. If one bank does not, another one will. There is no apparent limit to those seeking banking offices.

■ It seems to us that defendant banks are one very large step removed from *Penn-Olin*. In *Penn-Olin* the debate revolved around how much weight should be given to an unaccepted recommendation from lower echelons to move *de novo* into a new geographic area. In our case, the lower echelons did not make anything rising to the level of recommendations of programs which would have brought the two banks into competition, and even the lower echelons rejected the thought of their respective banks becoming statewide *de novo*. Accordingly, under the Supreme Court's rationale in *Penn-Olin*, the evidence does not sustain plaintiff's case. There the Court stated (378 U.S. at 166, 84 S.Ct. at 1714):

> Pennsalt claims that it finally decided * * * that it should not build a plant itself and that this decision was never reconsidered or changed. But the District Court found to the contrary.

There can be no doubt that Crocker-Anglo unequivocally rejected the idea of building even one branch in Los Angeles and adopted a *de novo* branching plan which excluded this possibility (Dirlam, Tr. 866–868; G-114; G-117; G-118).

■ The second proposition is that proof of entry or desire to enter by *merger* does not by itself prove the ability or desire to enter *de novo*. Many of plaintiff's proposed findings are based on this premise. If this line of reasoning were followed, all mergers would be illegal. In all cases the fact of merger, or contemplated merger, demonstrates a desire to achieve the advantages of the merger. Plaintiff states: "Crocker-Anglo had long been interested in moving into the rapidly expanding Los Angeles area", and it speaks of "Crocker-Anglo's desire to move into Los Angeles". The Government's propositions are true only if we add, "by merger", to them. Upon analysis, therefore, the Government's propositions are simply another way of stating that all mergers (except of failing businesses), are illegal or that "the most obviously

illegal aspect of the proposed merger is the merger agreement itself." This approach was clearly rejected in the majority opinion in *Penn-Olin*.

The third proposition is that if "potential competition" is defined as in *El Paso*, the Government's case clearly fails. In *El Paso* the Government proved potential competition by showing actual negotiation by Pacific Northwest with an El Paso customer for its business in the relevant market with tangible results: El Paso reduced its price (376 U.S. at 659, 84 S.Ct. 1044). Elsewhere in this opinion we have shown that plaintiff has failed to produce (even when ordered to do so) a single customer in the relevant market for whose custom both defendant banks competed. One purpose of the discovery order of this court was to determine whether plaintiff had an *El Paso* type case (Tr. of June 17, 1964; Tr. 16–17, 71, 73–74, 77–83). The Government's staff economist admitted he had no evidence, after searching the banks' files, that either bank was ever notified of the other's applications for branches, although such was the practice of the Comptroller in cases of competing branches. Plaintiff failed completely to prove any actual effect of potential competition such as was shown in *El Paso*.

The fourth proposition is that in this case the court knows what Crocker would have done had the instant merger been forbidden. This, in effect, was what happened in 1959 when Belgrano demanded too high a price for Transamerica's interest in Citizens and Hoover thought that all possibilities of merger with Citizens were gone. At that time every reason which the plaintiff and plaintiff's experts now assert for Crocker's moving into Southern California then existed. At the trial the court asked Mr. Hoover whether plans were made to move into Los Angeles at that time. As previously shown, Hoover explained that:

The subject came up quite frequently, your Honor, and was cast aside be-

cause we didn't have the horses, we didn't have the personnel.

Prior to that time, the former Chief National Bank Examiner for the area, who had had the opportunity and duty to examine all the applications for branches, had advised Hoover that it would not be economically sound for Crocker to enter this area *de novo* (Hudspeth G–338, pp. 18, 21). If this is not enough, we have additional proof that when Harry Rhorer, who had been hired from the Bank of America to recommend locations for the establishment of branches, developed an ambitious program of 30 branches a year, he specifically excluded the southern counties from the program. Moreover, management cut Rhorer's program approximately in half, so that for the foreseeable future Crocker would be expending all its *de novo* efforts in counties north of Los Angeles and expending 87 per cent of its efforts north of San Luis Obispo (G–115; G–117). In the final analysis, "desire" did not produce action and that in itself tends to negative the claim that Crocker would have entered Los Angeles *de novo*.

Accordingly, the voluminous findings that plaintiff proposes which show that subordinate officials in Crocker considered various areas in Ventura County; that *de novo* branching in communities contiguous to its service areas was profitable; that Crocker was interested in areas north of Los Angeles where population was expanding (principally Fresno, the Bay area, Sacramento and San Jose); and that when merger opportunities presented themselves, Crocker was interested in expanding into smaller metropolitan areas, are not particularly relevant to show that Crocker would have entered Los Angeles *de novo*. *The plain fact of the matter is that Crocker never established a branch in an area remotely similar to the Los Angeles metropolitan area and repeatedly rejected the idea.*

Plaintiff's "evidence" that eventually Crocker would have established a branch in the service area of Citizens or that

Citizens would have eventually established a branch in the service area of Crocker is speculative.

As we have already found, Crocker had no plans to enter Los Angeles other than by merger. Likewise, Citizens had no plans for establishing any branch north of Thousand Oaks in the Conejo Valley; Citizens had no plans for establishing *de novo* offices in the San Francisco Bay area or other areas of northern and central California (Hamilton, G–335, p. 19). The only suggestion that Citizens consider a location in San Francisco did not even go beyond the lower echelon committee which was to consider it (G–60; Gaffey, Tr. 1112). Dirlam testified that he was unable to predict when, if ever, Citizens would become a statewide bank (Dirlam, Tr. 840, 841). The Government's own exhibits and testimony show that Citizens' primary *de novo* activity was in Los Angeles County and south into Orange County. Similarly, Crocker's past *de novo* activity was devoted to the addition of needed branches within its own service area. Crocker generally entered the small metropolitan areas in its service area only by merger and established *de novo* branches contiguous to its administrative "hubs". When pressed to identify which *de novo* entries by Crocker were most comparable to what would be required for entry into Los Angeles, plaintiff could identify only Tulare and the City of Ventura. Accordingly, plaintiff's evidence consists of speculations by two economists with very limited experience with banking in California and with no branching experience at all. Thus, the "policies, program and history" of branch expansion by Crocker and by Citizens are valid indications only of what each bank would do within its respective areas. What factual basis does plaintiff have for saying it was more likely, advantageous or desirable for Crocker to establish branches in Los Angeles than within its own service area as it was planning to do? How can Crocker's financial success in establishing *de novo* branches in the smaller

contiguous communities in its service area be projected into the Los Angeles metropolitan area? Are the North Coast, Sacramento Valley, San Joaquin Valley, Mountain Counties and the South Coast really like the Los Angeles metropolitan area? All of plaintiff's data on the economics of Crocker's branching is speculative and carries little weight when projected into a wholly different area.

If, as in the case of Crocker, the files showed no surveys or other documents relating to Los Angeles, plaintiff would have the court conclude that Crocker had not considered and therefore had not rejected the idea of entering Los Angeles *de novo*. If, on the other hand, the files revealed a single sheet of paper referring to a particular locality, then the bank involved is said to have given "serious consideration" to establishing an office there, regardless of the fact that the document relied upon showed that the bank actually rejected the location as a branch site. Thus, plaintiff proposes a finding that Citizens had a "strong interest * * * in the Bay Area" because a single sheet of paper bears a notation suggesting that Citizens' bank premises committee should seriously discuss the advantages of establishing offices in downtown San Francisco and downtown San Diego (G–60; Gaffey, Tr. 1112). Similarly, plaintiff argues that Citizens was developing an interest in expanding into Porterville (it is in Tulare County) because Citizens' bank premises committee rejected a real estate broker's offer of property there (G–50).

The speculative nature of plaintiff's evidence is further demonstrated by its reliance on "half truths". Plaintiff proposes a finding: "In September 1962, it was the opinion of Crocker's branch locations specialist Harry M. Rhorer that Crocker should make 'special effort' in the 'major growth counties' of California, as these were the counties where the bank's location program had and, in Rhorer's opinion, should continue to have the greatest emphasis (Exh. G–

117, p. 4)." It is in this very exhibit that Rhorer proposes some 60 locations, *all in Crocker's service area,* most of them north of Santa Barbara; he also states, "our need to catch up in adequate representation throughout our present service area can support this magnitude of a program". Is it not pure speculation to rely on the so-called "policies" expressed in this document to show that Crocker-Anglo planned to go outside its service area, particularly when those "policies" are derived by misquoting the words of the document? Rhorer's memorandum stated that "special effort should be made in *our* major growth counties", not, as plaintiff would have it, in *"the* 'major growth counties'". (G–117, p. 4; italics added).

Plaintiff proposes a finding: "Crocker-Anglo had considered *de novo* branching as a *possible* means of expanding into the Los Angeles area. [Emphasis added.] Solomon, Tr. 1288, lines 3–15)." The full context of the reference follows (Tr. 1287, line 2—Tr. 1288, line 15):

Q. Yes. Mr. Solomon, may I show you, please, Government's Exhibit No. G–265 in evidence which you will recognize, I'm sure, as a letter signed by you to the shareholders of Crocker-Anglo Bank concerning the proposed Crocker-Citizens merger and I invite your attention to the next to the last paragraph.

A. Yes.

Q. Now, in that regard I'd just like to direct your more specific attention to one sentence in that paragraph:

"From our point of view the merger affords the most practical and economical way of immediately establishing our facilities on a large scale in the extraordinary growth areas centered in Los Angeles."

Now, you say there that this offers the most practical way. Having made a statement like that, am I correct that there were other ways that you had considered in making this statement?

A. I don't think it logically follows, Mr. Schoepke, that if this route had not been opened to us that there would have been other means which we would have availed ourselves of to get into that Los Angeles area. There was no question in our minds that the only way of getting into that area was through the merger route.

Q. Now, in making up your mind that this was the best alternative inevitably you must have considered some other alternative with which you compared this in stating that it was the most economical route.

A. I don't think there is any question but what if one considers an area attractive he explores all avenues that give any possibility whatsoever for accomplishing those objectives. In the process we gave consideration to the possibility of de novo but did not entertain it as constituting a reasonable answer to our problem at any time.

Q. But you did consider it?

A. As one of the alternatives, yes. Solomon also testified (Tr. 1281, lines 4–12):

Q. Would it have been financially disastrous for Crocker-Anglo to attempt to include Los Angeles and Orange in its service area without a merger?

A. Well, probably not, but I think it would have been so unsound from the standpoint of Crocker-Anglo to have recommended that course of action that I would not have proposed it and even though I had proposed it I would have expected our Board of Directors not to approve it.

Plaintiff's reliance on Solomon's testimony to show that Crocker would have branched *de novo* into Los Angeles is worse than sheer speculation because his testimony is to the contrary; possibilities don't become probabilities, especially when they are rejected.

The Government's brief asserts that Crocker would have branched into Los Angeles because the Los Angeles metro-

politan area "has long been noted for its tremendous economic growth and expansion"; because Crocker has long been interested in moving into the area; because Crocker was capable of entering into Los Angeles by itself; because Crocker had a nucleus of customers with record addresses in the area; because Crocker was operating offices in "Southern California". Every one of these reasons existed prior to 1959 and thereafter. Yet what happened in 1959, when after being approached by Citizens with regard to a proposed merger, the negotiations came to an "abrupt termination". Did Crocker make alternative plans to enter Los Angeles *de novo*? The 1959 to 1962 period is, in effect, an experimental period by which the validity of all plaintiff's theories can be tested. Being unable to enter Los Angeles by merger, Crocker nevertheless determined that the most profitable course for it was *de novo* branching in its then existing service area. It was not economically sound or feasible for Crocker to enter Los Angeles and it lacked the necessary personnel. Accordingly, plaintiff's statement, "There is nothing in the evidence to show that Crocker-Anglo, but for the merger, would not have done what the Bank of California did * * *" is demonstrably false. Government Exhibits G-114 and G-117 show the extreme outer limits of what Crocker would have done; they do not include Los Angeles or the other southern counties.

As heretofore noted, the population and other economic growth of the Los Angeles metropolitan area has been common knowledge since long before World War II. Yet Crocker made no attempt to establish *de novo* offices in that area. The reason for this is quite obvious; there are many growth areas in the former service area of Crocker, and while they may not be quite as dramatic as Los Angeles, their proximity and reduced cost of entry did and would continue to make them more profitable, particularly as part of an integrated system. The record shows that there were more than enough opportunities in Crocker's service area to keep it busy for the foreseeable future. The $12 million premium in terms of stockholders' equity running from the Crocker stockholders to Citizens shows only that the Crocker shareholders were willing to take a book loss in this amount in order to have the opportunity of having a well-organized and integrated bank of sound management with statewide facilities and offices in the Los Angeles metropolitan area. It does not prove that it was feasible for Crocker to so enter *de novo* or that it would have been advisable to expend that amount of money or the $30 million that *might* have duplicated such a system *if* they could get the permits, the locations and the personnel within the next eight or ten years at the very best. Our previous review of the situation in Los Angeles and the position of the Comptroller's office relative to this overbanked area pretty much proved Solomon's statement that any such program would have been economically unsound.

The "policies, program and history" of the Bank of California are wholly different from those of Crocker-Anglo. The Bank of California is a coastwide bank. The Bank of California had not committed its resources to a branch expansion program like that of Crocker-Anglo. Accordingly, at the time it established an office in Los Angeles, its resources in money and personnel were not otherwise committed. Dirlam testified that for Crocker-Anglo to enter Los Angeles it would have had to terminate its branch program elsewhere (Dirlam, Tr. 866-868, 625-626). Thus, it cannot be said that because The Bank of California thought it economical to enter Los Angeles, it was economical for Crocker to do so. As we pointed out in United States v. Crocker-Anglo Nat'l Bank, D.C., 223 F.Supp. 849, 859, "the Bank of California is a very special institution having the unique privilege of maintaining branches in several states, at Seattle, Portland, San Francisco and Los Angeles. One branch in Los An-

geles for that bank may well be worthwhile to permit it to advertise its interstate services and representation in all large metropolitan centers up and down the Pacific Coast. But for the purpose of furnishing a substantial competition in such a metropolitan area by *de novo* branching it is obvious that multiple branches would be required to take care of the very considerable business communities in Los Angeles County, such as Beverly Hills, Hollywood, Westwood, Burbank, Inglewood, Whittier, Glendora, Torrence, and the like, not to mention numerous centers in Orange and Riverside Counties."

Plaintiff concedes that the motivation for The Bank of California's entry into Los Angeles was "its own particular business reasons", which would not apply to Crocker.

If plaintiff were serious in its Bank of California analogy, it would have complied with the request of defendant banks to produce its files on The Bank of California's mergers with the Bank of Turlock, American National Bank of San Bernardino, Hollister National Bank and First National Bank of Long Beach to prove any alleged similarity to Crocker and Bank of California's alleged economic success in Los Angeles.

As we previously pointed out, had Crocker wanted to branch *de novo* into the Los Angeles area, it would have encountered serious difficulty because of the lack of available permits for which it would have been in competition with many others. The Comptroller has a policy of protecting smaller financial institutions in local markets from *de novo* branching by the larger banks. This being the case, Crocker could hardly expect favorable treatment in entering Los Angeles. Furthermore, it would be limited by initial costs, operating losses during the start-up period, availability of locations and personnel to staff branch offices. We know from the evidence that even though in 1962 Harry Rhorer had advocated a program of 30 branches a year to "catch up" in Crocker's *then existing service area*, manage-

ment cut the program back to a goal of approximately 18 branches a year to be attained in one or two years. One could, of course, speculate on the basis of arithmetic alone that any bank could establish any number of branches and that eventually the operation would be profitable. Practical limitations of personnel and the need for current earnings and dividends, however, set a limit on a bank's ability to expand and, accordingly, Crocker's ability on the basis of the substantial evidence in the case would seem to have been about 10 a year with a potential of approximately 18 a year. By 1963 the cost of physical facilities, already high, had gone higher; the time required to reach profitability and to recoup initial operating losses had lengthened substantially; and at the same time Crocker's management was confronted with the problem of maintaining earnings in the face of higher operating costs resulting from an increase in the rate of interest paid on savings deposits. It would seem that Crocker's branch program in its existing service area was clearly all that management could (and certainly all that it would) authorize. Therefore, any further plans would have required curtailing an existing, successful program in favor of one which it believed was economically unsound.

We have previously pointed out that Crocker decided not to establish *de novo* branches in Los Angeles. Crocker had tremendous opportunities to branch within its then existing service area and these it decided to exploit. It was necessary to do so to remain competitive. Thus, Crocker-Anglo was not in the position of Pennsalt, which enjoyed 57.8 per cent of its existing market at the time it decided to enter southeastern United States in the joint venture with Olin-Mathieson Company (378 U.S. at 162, 84 S.Ct. 1710). Pennsalt might well have exhausted its opportunities at home. Crocker was obviously not in this position, and its studies showed not only that there were opportunities in its existing service area, but that it would

be disadvantageous to the bank if they were not developed as soon as possible. Thus, Rhorer found that Crocker was under-represented in communities in eight important counties: Alameda, Butte, Contra Costa, Merced, San Joaquin, San Mateo, Sonoma and Stanislaus (G–114). As of the date of their merger there were at least 255 communities in Crocker's service area which had banks but in which Crocker was not represented (Tr. 1415–1417). In Rhorer's recommendation of September 1962, he listed 62 priority locations for future branching, which, with 21 outstanding permits and two pending applications for other locations, provided a backlog of 85 locations having immediate priority, none of which were south of Ventura County and only 11 were south of San Luis Obispo (G–115; G–117). In addition to those locations having immediate priority, there were sufficient other possibilities for profitable expansion within its own service area which could not be exhausted for at least 15 years (BK–U; Solomon, Tr. 1283). Thus, Crocker had adopted a specific program of future expansion which would have occupied it for the foreseeable future, which specifically excluded the southern counties.

Plaintiff's own exhibits show that the principal branching activity of Citizens during the period 1950 to 1963 was in Los Angeles County and south into Orange County. Of the 51 branches added to its system in that period of time, all but one were in Los Angeles, Orange, San Bernardino and Riverside Counties (G–15; G–16). Citizens' one branch in Ventura County was 20 minutes from Los Angeles. The predominant share of its branch location surveys and investigations concerned areas in Los Angeles and Orange Counties. Regardless of various locations considered by various members of the bank premises committee, Citizens did not adopt any plan to establish a branch in the service area of a branch of Crocker-Anglo. Although some of the lower echelon officials in the bank premises committee considered locations at places such as Bakersfield, Ventura, Oxnard and Santa Barbara, the committee at no time recommended to management that a branch be established in any of these locations and its recommendation that Citizens apply for Simi was rejected by management. Of the 19 permits of Citizens pending at the time of the application to merge, one was in Orange County, one in Riverside, one was in the Agoura area of Los Angeles near the Ventura County line, and the remaining 16 were in other sections of Los Angeles County (Ct. 195, Exh. 13, p. 70; Dirlam, Tr. 770). At the time of the merger there were at least 171 southern California communities having one or more banking offices in which Citizens did not have a branch, and many of these would have been desirable locations for Citizens (BK–T; Rhorer, Tr. 1413–1414, 1373). Plaintiff's expert, Dirlam, was unable to predict when, if ever, Citizens would have become a statewide bank (Tr. 840, 841). Hamilton's vague suggestion that Citizens' bank premises committee discuss the advantages of establishing a branch in downtown San Francisco was never seriously considered even by the bank premises committee.

Insofar as the economics of the situation are concerned, plaintiff is faced with the experience of Security First National Bank. It has had one or more offices as far north as Fresno since prior to 1946 and is much larger than Citizens. It has not yet established a branch in San Francisco. What makes plaintiff think that Citizens would precede Security in establishing offices in northern California? And if it did not, how may permits would be left for Citizens? As it is, plaintiff's own exhibits show that Citizens would be competing with 42 other banks in attempting to obtain the one or two permits which plaintiff estimates will be authorized for San Francisco prior to December 1, 1980. Accordingly, there is no reasonable probability that Citizens would have become a statewide bank absent the instant merger

or that Citizens would have established branches in Crocker's service area.

## CONVENIENCE AND NEEDS OF THE COMMUNITY TO BE SERVED.

 Pursuant to the mandate of the Supreme Court that "the offsetting community 'convenience and needs,' as specified in 12 U.S.C. § 1828(c) (5) (B), must be pleaded and proved by the defenders of the merger", United States v. First City National Bank, 386 U.S. 361, 364, 87 S.Ct. 1088, 1091, 18 L.Ed.2d 151 (1967), on review *de novo* we find that the defendant banks fully sustained their required burden of proof and unequivocally established that any hypothesized anticompetitive effects stemming from the instant merger were clearly outweighed by the merged bank's increased ability to meet the convenience and needs of the community to be served.

 The merger of Crocker and Citizens was clearly beneficial in that it (a) caused an immediate increase in the number of statewide banks competing within the state, (b) produced a bank having increased ability to mobilize financial resources in a capital deficit area, (c) created a bank which is better equipped and therefore more likely to engage in credit gap financing, (d) created another substantial competitor in the underwriting of municipal bonds, and (e) enhanced the merged bank's ability to compete more vigorously in international banking and to provide additional services to those engaged in international trade.

The evidence in this case establishes that each of the above enumerated conveniences and needs of the community to be served was beneficially served by the instant merger. Each will be separately considered.

A. *The Merger Met the Need in California for Another Bank With Statewide Facilities.*

Prior to the merger, the Bank of America had a near monopoly among banks capable of performing a statewide banking service (Nicols, Tr. 2263,

2264). From the standpoint of California's banking structure, the merger was desirable in that it provided an additional statewide competitor for the Bank of America (Saxon, Tr. 2062–2063, 2066). There was a need for another statewide bank to provide some statewide balance in California banking (Saxon, Tr. 2066). Plaintiff concedes this (Plaintiff's Response to Request for Admission of Fact No. 6, filed July 11, 1964). The immediate and certain offset of the merger was to create a bank capable of meeting the convenience and needs of communities in California for another bank with statewide facilities (Ct. 195, Exh. 13, p. 9; BK–A, p. 59; Nicols, Tr. 2265).

The merger of Crocker and Citizens caused an immediate 50 per cent increase in the number of statewide institutions and doubled the number of effective, formidable statewide competitors of the Bank of America (Goodman, Tr. 2171; Saxon, Tr. 2037), an effect which would not have been possible by *de novo* branching. Had that method been attempted, it would have taken eight to ten years without any assurance that an effective statewide system would be achieved even then (Weston, Tr. 2162).

In addition to the many communities where the merged bank constitutes a second or a third statewide competitor of the Bank of America, there are many others where it provides the only statewide competition to the Bank of America. Crocker-Citizens is the only statewide competitor of the Bank of America in communities in seven counties (Colusa, El Dorado, Napa, Sutter, Tehama and Yolo) (BK–QQ). Even in counties where the United California Bank or First Western have one or more offices, there are many communities where Crocker-Citizens is the Bank of America's only statewide competitor. Examples are Oxnard in Ventura County, Taft in Kern County, and Lompoc in Santa Barbara County (BK–M; BK–N; BK–O). By creating another statewide bank, the Crocker-Citizens merger improved upon the existing banking structure in

California (Ct. 195, Exh. 13, p. 9; Nicols, Tr. 2265).

The merger of Crocker and Citizens afforded the only practical possibility of founding another substantial statewide competitor to the Bank of America (Saxon, Tr. 2038). No bank in California has ever become statewide *de novo* (Nicols, Tr. 2268, 2269; Weston, Tr. 2157). The Bank of America achieved a statewide system in the 1930s only after very extensive acquisitions consummated during the 1920s (Weston, Tr. 2157, 2158). The present First Western Bank and Trust Company and the United California Bank were both the progeny of mergers (G–26).

The public interest and the needs and convenience of the many communities where Crocker-Citizens now has or will in the future establish offices will be better served by reason of the merger. The existence of a bank with statewide facilities is a distinct benefit to all users of banking services, including both borrowers and depositors (Nicols, Tr. 2255; Lishan, Tr. 2341; BK–A, p. 59).

### B. *The Merger Provides More Effective Mobilization of Financial Resources.*

California is a capital import state and will be such for years to come, since it is unable to generate sufficient capital to accommodate the public and private needs to sustain the growth of the state (Saxon, Tr. 2039). The creation of another statewide bank helped to alleviate this adverse situation and served the convenience and needs of California by providing a more effective mobilization of the financial resources within the state. The importance of mobilization of funds to the state and local communities is reflected in the very substantial amount of bonds issued by the state and its political subdivisions each year (G–353; Saxon, Tr. 2067–2068). The substantial amount of federal funds imported into California is also a reflection of the need for funds to finance highways, schools and the growth of the state in general (Saxon, Tr. 2070).

It is, of course, true that California was not totally lacking in institutions capable of mobilizing financial resources within the state (Weston, Tr. 2137). Other financial intermediaries contribute to mobility of funds. Correspondent banking also provides some mobility of funds (Weston, Tr. 2139). However, a statewide branching system permits more effective mobilization of funds than correspondent banking in that transfer of credits by statewide banks is less cumbersome and can be made more quickly and at less expense than through the correspondent banking system (Goodman, Tr. 2213–2215). Thus the creation of another statewide bank constitutes a substantial improvement upon the ability of California banks to mobilize the state's resources (Saxon, Tr. 2047). And if the contribution of other financial intermediaries is excluded, the resulting bank's increased ability to distribute surplus funds to areas having needs for loans in excess of deposits is a particularly significant benefit, especially to the potential borrowers affected (Weston, Tr. 2169).

In adopting laws permitting statewide branch banking, California endeavored to achieve the most efficient allocation and distribution of financial resources within the state, that being one of the principal attributes of statewide branching (Goodman, Tr. 2172, 2173; Saxon, Tr. 2047, 2048). Thus the merger of Crocker and Citizens improves upon the banking structure by creating a bank of a type the state has found to be beneficial (Saxon, Tr. 2047).

The Crocker-Citizens merger enabled the resulting bank to make more effective use of the state's financial resources by permitting the bank to transfer funds from areas in which there may be an excess of deposits to areas where there is a greater need for loans (Weston, Tr. 2168, 2169). Lending credits not needed in an agricultural area can be transferred to an industrial area experiencing more rapid growth, and seasonal credit needs in one area can be met with sea-

sonal surpluses in another (Goodman, Tr. 2172).

The merger also had the effect of increasing the banks' aggressiveness in meeting the convenience and needs of the community for loans in another respect. Crocker-Citizens now has a loan to deposit ratio of approximately 70–71 percent, which is in line with that of other California banks. Had there been no merger, Citizens' ratio would have remained substantially lower. It followed a much more conservative loan policy than Crocker, as indicated by the contrast between its pre-merger ratio of 56 percent and Crocker's pre-merger ratio of 64 per cent. (Solomon, Tr. 2095, 2096). Thus the merger has resulted in a larger amount of funds available for loans in southern California communities.

The Government sought to meet the effect of this evidence by asserting through Professor Nicols that the capital deficit in California was a consequence of high concentration. Nicols admitted, however, that his opinion was contrary to the general opinion, that the subject was highly controversial and that his opinion assumed that the state as a whole was a market. But there is no convincing evidence that the state is a market; the only empirical evidence is to the contrary. The substantial evidence leads this court to find that the instant merger provides a more effective and needed mobilization of financial resources.

C. *The Increased Size and Geographical and Industrial Diversification of the Merged Bank Increases Its Ability to Engage in Credit Gap Financing and the Probability of Its Doing So.*

Credit gaps exist for various kinds of loans for which the amount of financing available is not as large as is thought socially desirable. That such credit gaps exist and that it is socially desirable to fill those gaps is shown by federal programs aggregating over one hundred billion dollars in direct and insured loans in housing, small business and transpor-

tation (Weston, Tr. 2122). Geographical diversification increases a bank's ability to engage in credit gap financing and to undertake a volume of higher-than-normal risk loans because of the principle of statistical averaging. The increased size and geographical and industrial diversification resulting from the merger will not only increase the merged banks' ability to undertake credit gap financing but it will also increase the probability of its doing so (Weston, Tr. 2139–2140). This has been the experience of the Bank of America (Weston, Tr. 2124). Professor Nicols admitted that large banks provide more financing for small businessmen than do smaller banks. From an economic standpoint, it is desirable to increase the number of institutions willing to undertake filling of the credit gaps. Large risks are associated with loans to new industry and new and small businesses. Yet their contributions to the economy are substantial. Therefore, any increase in the number of banks willing to undertake financing small business is beneficial.

D. *The Merger Created Increased Competition Among Underwriters of Municipal Bonds.*

There can be no doubt that since the merger Crocker-Citizens has become a significant competitor in municipal bond underwriting. Prior to the merger, Citizens did not engage in this business and Crocker was not a significant competitor. There was no actual or potential competition between Crocker and Citizens in the municipal bond business. The effect of additional competitors for municipal bonds is demonstrated by the fact that the creation of United California Bank and the creation of Crocker-Citizens and the resulting increased activity in bidding for bonds coincided in each instance with a substantial drop in the cost of municipal bond financing to California communities.

To illustrate the effect of increased competition upon the cost of bond financing for California municipalities, defendant banks prepared an exhibit com-

paring the yield (interest costs) of California municipal bonds with the national average yield, which, for purposes of comparison, was shown as "100". Plaintiff had no question as to its accuracy (Statement of Plaintiff's Counsel, Tr. 2024). The exhibit shows that prior to February 1961, when the United California Bank was formed (G–30, n. 2), the yield on California bonds was seldom below 102 per cent of the national average, that it was frequently above 104 per cent and averaged approximately 103.4 per cent of the national average (BK–HHH). During the period February 1961 to February 1963 there was a sharp drop in the California bond yield. During that period of time the California yield was in excess of 102 per cent of the national average in only five months, was less than 101 per cent of the national average in eleven months and averaged 100.96 per cent of the national average. In February 1963 Crocker sharply increased its competition in the underwriting of municipal bonds in anticipation of the pending merger (Solomon, Tr. 2085, 2086). The yield on California bonds again took a sharp drop and at no time since has the yield ever gone as high as 102 per cent of the national average. Notwithstanding an almost 50 per cent increase in the total amount of municipal bonds sold during the period 1963 to 1965 (G–353) and an increasingly tighter money market and rising interest rates (G–361, pp. 9, 11), the average yield on California municipal bonds during this period dropped to 100.31 per cent of the national average. This reduction in the yield on California municipal bonds is a direct result of increased competition (Goodman, Tr. 2179). Although other factors undoubtedly affect the yield on California municipal bonds, the lower interest rates of California municipal bonds was in large part due to the increasing competition by United California Bank and the advent of Crocker-Citizens as a substantial underwriter of California municipal issues.

California municipalities are now issuing bonds at a rate in excess of $1.5 billion a year (G–353; Goodman, Tr. 2182). If increased competition results in lowering the interest cost of those bonds by fifteen basis points, the resulting savings to California municipalities would amount to approximately $22.5 million, which might then be more beneficially employed for better schools and similar undertakings (Goodman, Tr. 2182).

Plaintiff's witness, Lishan, characterized most of the municipal bond issues on which Crocker-Citizens bid as being small (Lishan, Tr. 2344). It is on just such issues where increased competition might have the most beneficial effects. As a general rule, municipalities have to pay higher interest costs on small issues (Lishan, Tr. 2333).

The merger was particularly important to southern California communities because as a result of the merger Crocker-Citizens has submitted bids in smaller southern California communities in which neither Crocker nor Citizens submitted bids prior to the merger.

Plaintiff's attempt to contradict this showing was less than candid; its evidence omitted dollar amount; it used 1963 as the base year, when in fact Crocker stepped up its underwriting activities that year in anticipation of the merger; it omits many smaller issues of bonds; it omits two purchases totaling $510,000 in 1965; it excludes all out-of-state issues; and one exhibit purporting to show the effect of Crocker-Citizens' competition omits every issue on which Crocker-Citizens had submitted the highest bid other than one or two which were included by mistake. Considering the fact that unsuccessful bidders provide effective competition, United States v. El Paso Natural Gas Co., 376 U.S. 651, 661, 84 S. Ct. 1044, 12 L.Ed.2d 12 (1964), it is unrealistic to say that Crocker-Citizens has not been a highly competitive and effective bidder. Since 1962 it has more than tripled the dollar value of its successful bids, made more than a tenfold increase in the dollar value of bonds it has helped underwrite as a comanager, established itself as a first or second bidder from 25

to 40 per cent of the time and cut deeply into the Bank of America's share.

### E. The Merger Created a Bank Capable of Substantially Greater Participation in International Banking.

Neither Crocker nor Citizens were substantial factors in international banking prior to the merger. It is desirable to have another bank in California endeavor to become a substantial factor in international banking so as to provide better service to exporters and an additional competitor to the Bank of America.

Lishan's initial opinion that prior to the merger each of the merging banks had substantial international business was based on a misconception. On cross-examination, however, it became apparent that he had misread certain figures and that his conclusion was admittedly based on erroneous assumptions and would have to be modified (Tr. 2357, 2359). The increase in the merged bank's financial base resulting from the merger enabled the merged bank to undertake expansion of its international banking business consistent with prudence and sound banking. As Mr. Solomon testified, it would not have been prudent for Crocker to have undertaken such expansion prior to the merger (Tr. 2107–2109). Banks the size of Crocker are not significant in the international banking business. Size is of great importance in international banking because of the risks involved, the need for specialized experts, and the desirability of opening foreign offices. Significantly, the foreign banks doing business in California have a substantial number of offices in their home territories and elsewhere. Since the merger, Crocker-Citizens has definitely indicated its interest and desire to expand into the international banking field. It has formed an Edge Act corporation; it has established foreign offices in Manila and London and has taken steps to open an office in Brussels; it has substantially increased the amount of funds available for use in international banking; the total footings of the balance sheet of the merged bank's international department have increased more than 50 per cent. Crocker-Citizens' expansion in international banking would have progressed further were it not for the restrictions imposed by the Government's voluntary restraint program. Even so, its record is one of solid achievement and in at least one respect Crocker-Citizens has surpassed all California banks other than the Bank of America. No other California bank has more than one foreign office. With the opening of its Brussels office in June, Crocker-Citizens now has three.

Plaintiff's attempt to minimize the progress which Crocker-Citizens has made in this field by an exhibit purporting to show the amount of acceptances held by defendant banks and the eight largest banks is incomplete and deceptive because it reflects very substantial domestic as well as foreign trade acceptances, because the amount of acceptances held on specific dates shows neither the bank's commitment to international banking nor the volume of business handled and because acceptances purchased by the bank or sold on the open market are transferred to loan accounts.

While there may be some argument as to whether a particular transaction may or may not benefit the balance of payments problem, there can be no serious argument that the creation of another competitor to the Bank of America in various communities in California in this field and the stimulation of additional international banking activity is other than desirable.

### F. These Benefits Clearly Outweigh Any Hypothesized Anti-Competitive Effects of the Merger.

Plaintiff produced no direct evidence on the "weighing" issue. Plaintiff sought only to minimize the beneficial effects of the merger. On the other hand, both Professors Goodman and Weston rendered opinions as to whether the admitted benefits clearly outweighed the alleged anticompetitive effects. Consistent with his original hypothesis that there were no anticompetitive effects and

that the effects of the merger had to be weighed in the total financial market, Professor Weston opined that the merger was desirable from a competitive standpoint and that it had neither immediate nor potential anticompetitive effects (Weston, Tr. 2136). Because he viewed the effects of the merger in the context of a line of commerce which included all competing financial institutions, he readily admitted that the benefits accruing from the merger would be small in relationship to the total line of commerce, but by the same token, he testified that any assumed anticompetitive effects could not be large. In his opinion the overall effects of the merger were procompetitive, in the right direction and beneficial (Weston, Tr. 2145–2146).

Professor Goodman went further in hypothesizing anticompetitive effects in order to obtain a relationship to permit a "weighing". From an economic standpoint, Professor Goodman carefully attempted to weigh the alleged anti-competitive effects against the benefits to the public interest in meeting the needs and convenience of the communities to be served by the resulting bank. It is something new in antitrust law (Goodman, Tr. 2194–2195). He drew upon his experience in other fields and in particular upon the economic "cost-benefit theory", which was developed to determine the relative advantages and disadvantages of public projects. This theory provides a method of weighing the costs in terms of existing advantages which will be lost by a particular public project against the benefits to be gained by it. Familiar examples involve freeway construction where the costs include the removal of property from the tax roll and the eviction of people from their homes and where the benefit is increased speed of transportation through the community and lowering of transportation costs (Goodman, Tr. 2195). In using that theory, Goodman assumed (contrary to his opinion) that the merger had anticompetitive effects (Goodman, Tr. 2186, 2194). As costs, he

weighed these effects against the merger's benefits set forth in A through E immediately above and concluded that when the costs were balanced against the benefits, the benefits clearly outweighed any and all the anticompetitive effects which could be hypothesized (Goodman, Tr. 2197). The Government's witnesses did not render any countervailing opinions encompassing these aspects of the case. Furthermore, the Comptroller of the Currency reached a similar conclusion in his decision and at the trial testified that the benefits of the merger clearly outweighed any possible anticompetitive effects and will do so to an even greater extent in the years ahead (Tr. 2036–2037, 2066; BK–A, pp. 58–60).

The Government's principal attack on this conclusion seemed to be the assertion that this particular merger was not an absolute necessity in order to obtain these desirable results. Yet plaintiff conceded the need for additional statewide banks and its expert, Professor Lishan, readily testified that in considering the matter of convenience and needs from an economic standpoint, he would admit that an additional competitor met the convenience and needs of a community, even though existing facilities were adequate to handle existing trade and the establishment of an additional competitor was not an absolute necessity (Tr. 2278).

Before concluding our discussion of the convenience and needs of the community to be served, we note that in the laboratory of two and one-half years' experience since the merger,[37] the Government has failed to produce any instance of any adverse effect of this merger, while defendant banks have produced evidence of substantial, tangible benefits to the communities served by the resulting bank. Even if we were to accept the Government's allegations at face value, the benefits of immediately adding an additional competitor, in markets consisting of three (statewide facilities) or six or seven (municipal bonds and international finance) competitors, would clearly out-

---

**37.** Plaintiff's expert, Gaffey, testified that such harmful effects should be observable in two or three years.

weigh the possible loss of an additional competitor in markets consisting of 85–90 (Los Angeles and Orange Counties) and over 200 (state as a whole).

## THE CLARKE MEMORANDA.

Before concluding, the court deems it advisable to briefly review the memoranda of Dwight Clarke (G–329; G–330), upon which plaintiff so heavily relies. The review is made at the close of this opinion, in order that it may be more effectively weighed in the light of the preceding pertinent facts. These two documents are virtually identical and were prepared to present Clarke's reasons "Why shareholders of Citizens National Bank would benefit from an exchange of their stock for that of Crocker Anglo National Bank in a merger where 'Citizens' would appear prominently in the new bank's name." The first was prepared for presentation to the Executive Committee of Citizens on December 6, 1962, and was based upon the then exchange offer of 1.8 shares of the combined bank for 1 share of the then Citizens National Bank, and the second was presented to the Board of Directors of Citizens on February 7, 1963, and was based upon the exchange offer of 1.9 shares of the combined bank for 1 share of the then Citizens National Bank. The essential portion of the memorandum of February 7, 1963 recites:

> In only a little more than a decade, Los Angeles and San Francisco have grown much closer geographically. A very few years back it required an eleven or twelve hour journey to go from one city to the other; now it takes a little over an hour, and who is bold enough to say that that time will not continue to shrink? The completion of the vast Central Valley-Feather River water project will eventually bring greater unity of interests to the entire state.

> Considering the policy of the federal government concerning mergers and anti-trust, we may never again have as happy a conjunction of events en-

abling us to become part of what would be the second largest statewide bank in California and the third or fourth largest bank in the state. Citizens and Crocker at present do not compete, yet the territory separating our two systems is constantly narrowing. When either bank goes very far north or south of their present areas, a serious bar to any merger would automatically be created.

If we make no deal with Crocker, our future possible choices for a merger would be extremely limited. None of these other possibilities would be as mutually complementary as a Citizens-Crocker marriage. There is such a thing as compatibility among banks. Citizens and Crocker-Anglo have progressed along similar enough lines in the development of new business, credit policies and branch expansion to lead one to believe that in a merger the two managements would establish a harmonious basis for cooperation. As correspondents participating in loans, the officers of the two institutions have become well acquainted so would start their combined management with probably the minimum of friction.

Only a few days ago the Bank of California announced that it will open its first branch in Los Angeles. That means one more competitor and one less possibility of a merger. Since Crocker has stated its desire to enter Southern California, it is inevitable that if the present proposal is not concluded, Crocker will otherwise enter this area through merger or through de novo branches. Also the recent sale of the First Western Bank suggests that this statewide bank may be expected to become a more aggressive competitor.

All these facts impel me to urge that this subject be given very serious study lest we gravely cripple the future progress of our institution.

When called as a witness by plaintiff, Clarke testified as to his position with

Citizens, the circumstances relating to the preparation of the memorandum and the purpose he hoped to achieve thereby.[38] Now, who was Dwight Clarke? True, he

38. Clarke testified as follows:

Q. Now, during the time, that period of time that you were a director [of Citizens], would you say that you were a representative of Transamerica on the Board?

A. I suppose I could be called that. I was elected by their stock, stock they controlled, together with some other people.

* * * * *

A. I was on their [Citizens'] Executive Committee * * *. (Tr. 1235)

Q. Could you tell us how you went about preparing this document?

A. Well, at this time, the date on this is December 1962, at this time active consideration was being given to the offer that had been made of an exchange of stock of Crocker for Citizens and I was very much convinced of the desirability of such an exchange. I felt it was greatly in the interest of the stockholders of the bank, of the staff of the bank and of the customers and the general public, and I was an active and vigorous proponent of the merger.

There was opposition in the beginning, considerable serious opposition on the part of some of the other directors, some of the members of the Executive Committee, and we had many meetings about it and much discussion. * * *

* * * * *

Therefore, I do this as a, what I considered like a sales approach, *it was a sales approach, it was all the arguments I could think of* to back up my claim that the merger was most desirable and *I tried to do a selling job* in preparing this argument and develop the various facts that appear in it as to—from data of various sorts that I gathered, had gathered. (Tr. 1238–1239) (Italics supplied).

A. Yes, that's right, this is dated February 7, 1963. This is the one that I read aloud to the Board of Directors and provided each, presented each one of them with a copy of it. (Tr. 1241)

A. I showed a copy of it to—in fact, gave a copy of it to Mr. Brauer as a Chairman of the Board of Transamerica and a copy to Mr. John Beckett, the President of Transamerica, because they were such large stockholders and *they were cognizant of what I was doing* and I gave them copies of it about the time they were made.

* * * * *

A. * * * the merger could not be made without their full cooperation, full approval, and so *they knew everything I was doing about that because I had originally heard about the offer through Mr. Beckett.* (Tr. 1242) (Italics supplied).

A. Yes, it was voted on after this was presented, this second document dated February 7, it was voted on in a meeting, I think, the 19th of February 1963 and both the argument for and the argument against were presented at that time. (Tr. 1247–1248).

Q. Then, Mr. Clarke, since you prepared these two documents, the opinions that appear in there are yours, are they not?

A. They are my opinions, they are *my guesses* as to a lot of things. *It was my sales argument.* (Tr. 1249) (Italics supplied).

MR. ARCHER: May I ask one question?

Q. Mr. Clarke, do you have any information about what Crocker-Anglo's plans for branching were other than what appears right in the memorandum itself?

A. None whatsoever.

Q. Did you negotiate this at all with either Mr. Hoover or Mr. Solomon?

A. I never saw nor talked to nor had correspondence with either Mr. Hoover or Mr. Solomon during the negotiations. In fact, I had never met Mr. Solomon until after the merger agreement was signed * * *. And only saw Mr. Hoover, although I knew him, I had known him a number of years before, but I only saw them for the first time sometime after the merger agreement in the spring of '63. (Tr. 1250–1251).

The court thereafter, ruling on the offer of G–329 and G–330 in evidence, through Judge Pope, said:

Now, this tends to confirm what he has said in respect to his activities, and we therefore think that it is admissible solely for the purpose, as against Transamerica and as against Citizens, to show that they collaborated in bringing about this merger.

So far as the opinions in there are expressed, we regard those as wholly inadmissible and they will be disregarded by the Court, particularly the opinion as to what Crocker-Anglo might do, because this witness has not shown him-

was a banker of thirty years' experience and a member of the Board of Directors and the Executive Committee of Citizens, but his basic role in Citizens was that of representative and spokesman of Transamerica (he was placed there by Transamerica and was referred to by Mr. Britt, President of Citizens, as the "Transamerica representative" on the Board) and protector of Transamerica's 41 per cent interest in Citizens. When he prepared the memoranda and before presenting them to the Citizens organization, he discussed them with Beckett and Brauer of Transamerica and secured their approval. The success of the merger was vital to Transamerica because (1) it wanted to divest itself of its 41 per cent interest in Citizens for fear that by voting it at a meeting of the stockholders it might turn out to be a vote in excess of 50 per cent of the stockholders voting at a meeting and thereby make Transamerica a bank holding corporation with all its enterprises and subsidiaries throughout the world subject to examination by the Federal Reserve Board at the expense of Transamerica, and (2) because it was getting the equivalent of 41 per cent of a $12 million premium, a sum equal to $4,920,000. This was the interest for which he was making his "sales pitch" against considerable opposition. Hence, it matters not how you characterize his memorandum of February 7, 1963, whether as an opinion, sales approach, selling job or guess, it was a statement made purely in the interest of Transamerica and could never qualify as an unbiased, objective opinion of probative value. We attach very little weight to Mr. Clarke's statements, for his words do

not begin to speak as loudly as the deeds of Crocker in centering its branching activities within present service areas and its refusal to entertain or make plans for entry into the Los Angeles service area of Citizens. In view of the banking situation in the Los Angeles area, his statement could not have affected knowledgeable bankers in that already over-banked area, since new competition is ever present at the periphery, and it makes little difference who that competition is, since, as we already know and previously related, in recent years there have been twice as many applicants as there have been permits granted for the Los Angeles area.

## CONCLUSION.

■■ Throughout the trial plaintiff contended that a decision in this case upholding the legality of the instant merger would violate the basic legal principles on potential competition enunciated in the more recent opinions of the Supreme Court. The short answer to this contention is that plaintiff failed to prove that the probable effect of the merger would be a substantial lessening of competition in any section of the country. This is a fact question. Our decision in this case in no way runs counter to the teachings of the Supreme Court, since it turns not on any differing legal principles, but upon a particular factual situation which is entirely different from that prevailing in any of the cases relied upon by plaintiff and one from which no potential adverse competitive effect in any section of the country may be reasonably inferred. A further detailed analysis of these factual differences be-

self to be privy to the inter-workings of the management of Crocker-Anglo.
So if it is expected by the Government that this will tend to prove what the plans and purposes and intent of Crocker-Anglo would have been at that time, we regard that as wholly inadmissible and when it was first offered we regarded that as so entirely inadmissible and prejudicial that we first ruled that it would not be admitted for any purpose.

But for the limited purposes which I have just stated, it will be received. We do not regard it as any proof whatsoever as to the purposes and intentions of Crocker-Anglo, in fact, the witness, if I heard him accurately, said it contained some of his guesses.
That is the ruling of the Court. It is admissible for the limited purposes indicated as against Transamerica and Citizens only. (Tr. 1253–1254).

yond that already herein expressed would serve only to encumber what is already an all too voluminous opinion.

The court repeats that plaintiff has failed to prove that the instant merger may tend substantially to lessen competition, actual or potential, or tend to create a monopoly, in any section of the country, and that even if we were to hypothesize any such anticompetitive effects, such effects are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served. Accordingly, judgment is granted in favor of defendants and against plaintiff and the complaint is dismissed. Defendant banks shall prepare and submit an appropriate form of judgment to the court.

The foregoing opinion and footnotes constitute the court's findings of fact and conclusions of law, as required by Fed. R.Civ.P. 52(a).